# Exhibit 7

to

# Defendant's Motion to Dismiss



F-ile

IN REPLY REFER TO:

# United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
Room E-2740, 2800 Cottage Way
Sacramento, California 95825

February 6, 1976

Commissioner Morris Thompson
Bureau of Indian Affairs
Department of the Interior
C Street
Washington, D. C. 20240

Re: Controversy Between Mesa Grand Band and Santa Ysabel Band of Mission Indians Concerning Ownership of Certain Reservation Lands in California

Dear Mr. Thompson:

I have enclosed recommended findings of fact, two volumes of transcripts of hearings, sixty-five exhibits, and a file pertaining to this controversy. I believe that the file is sufficiently explanatory of how the matter came to me for hearing.

I allowed the parties fifteen days after date of mailing of my recommended findings of fact within which to file exceptions or requests for extension of time within which to file exceptions to my findings. Such exceptions, if any, will be forwarded to you.

I would appreciate it if you would send me a copy of your determination.

Sincerely yours,

William E. Hammett
Administrative Law Judge

Enclosures

cc: California Indian Legal Services, P. O. Box 1868, Escondido, CA 92025
    w/copy of recommended findings of fact (for Mesa Grande Band of
    Mission Indians)
    Mr. Don A. Proudfoot, Jr., Attorney at Law, 100 Oceangate, Long Beach,
    CA 90802 w/copy of recommended findings of fact (for Santa Ysabel
    Band of Mission Indians)
    Superintendent, Southern California Agency, Bureau of Indian Affairs,
    6848 Magnolia Ave., Suite 8, Riverside, CA 92506 w/copy of recommended
    findings of fact

cc: (Continued)
    Area Director, Sacramento Area Office, Bureau of Indian Affairs,
      Room w-2550, 2800 Cottage Way, Sacramento, California 95825
      w/copy of recommended findings of fact
    Mr. James E. Ponchetti, individually and as Spokesman, Santa Ysabel
      Band of Mission Indians, General Delivery, Santa Ysabel, California
      92070 w/copy of recommended findings of fact
    Mr. Jack Hamilton, individually and as Chairman of the Mesa Grande
      Band of Mission Indians, Mesa Grande Star Route, Santa Ysabel,
      California 92070 w/copy of recommended findings of fact

IN THE MATTER OF THE DISPUTE BETWEEN
THE MESA GRANDE AND SANTA YSABEL BANDS OF
MISSION INDIANS CONCERNING THE OWNERSHIP OF CERTAIN
RESERVATION LANDS IN CALIFORNIA

BACKGROUND

On October 21, 1974, and February 4, 1975, hearings were held in San Diego, California, pertaining to a question of entitlement to beneficial ownership of certain reservation lands in California, hereinafter referred to as Santa Ysabel Tracts 1, 2, and 3, or sometimes as Tracts 1, 2, and 3, which tracts are more fully described in the hearing record. The Santa Ysabel Band of Mission Indians was issued patents to these three tracts of land.

The controversy arises from the following circumstances. By Executive Order dated December 27, 1875, President U. S. Grant withdrew from sale and set apart as reservations for the permanent use and occupancy of the Mission Indians in Lower California certain lands in San Diego County, San Bernardino base and meridian, describing among other tracts, the following:

> Santa Ysabel.--Including Mesa Grande, township 11 south, range 2 east, south half of section 21, northwest quarter, and east half of section 28, and sections 25, 26, and 27; township 11 south, range 3 east, sections 25, 26, 27, 28, 33, 34, 35, 36, and fractional sections 29, 30, and 32; township 12 south, range 2 east, sections 3, 10, 14, 15, and fractional section 13; township 12 south, range 3 east, sections 1, 2, 12, and fractional sections 3, 4, 10, 11, 13, and 14;

Subsequently, on January 12, 1891, the Congress enacted legislation entitled, <u>An Act for the Relief of the Mission Indians in the State of California</u>, 26 Stat. 712, which provides in relevant part:

11/04/2008 08:46 FAX ⌨013/027

>     That immediately after the passage of this act the Secretary
> of the Interior shall appoint three disinterested persons as
> commissioners to arrange a just and satisfactory settlement of
> the Mission Indians residing in the State of California, upon
> reservations which shall be secured to them as hereinafter
> provided.
>     SEC. 2. That it shall be the duty of said commissioners
> to select a reservation for each band or village of the Mission
> Indians residing within said State, which reservation shall
> include, as far as practicable, the lands and villages which
> have been in the actual occupation and possession of said Indians,
> and which shall be sufficient in extent to meet their just
> requirements, which selection shall be valid when approved by
> the President and Secretary of the Interior. . . . .
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>     SEC. 3. That the commissioners, upon the completion of
> their duties, shall report the result to the Secretary of the
> Interior, who, if no valid objection exists, shall cause a patent
> to issue for each of the reservations selected by the commission
> and approved by him in favor of each band or village of Indians
> occupying any such reservation, which patents shall be of the
> legal effect, and declare that the United States does and will
> hold the land thus patented, subject to the provisions of section
> four of this act, for the period of twenty-five years, in trust,
> for the sole use and benefit of the band or village to which it
> is issued, . . . .

Under authorization of this Act, the Secretary of the Interior appointed a commission, which became popularly known as the "Smiley Commission", to carry out the purposes of the Act. The commission performed its task and made recommendations to the Secretary. Thereafter, in 1893, land comprised of what has been herein designated as Tracts 1, 2, and 3 was patented to the Santa Ysabel Band of Mission Indians for its sole use and occupancy.

The Mesa Grande Band claims that patent to Tracts 1 and 2 should have been issued to it rather than to the Santa Ysabel Band, and from this claim the controversy arose which resulted in the hearings.

At the first hearing, the Mesa Grande Band was represented by Mr. Ronald Albu, an attorney with the California Indian Legal Services and the

2

Santa Ysabel Band was not represented by legal counsel, although Mr. James F. Ponchetti consented to act as spokesman. During the course of this hearing, Lowell John Bean, PhD, who had entered into a contract with the Bureau of Indian Affairs, gave testimony as to the relationship between the bands. After the first hearing, Dr. Bean submitted a report, incorporated within the record as Exhibit 64, and accompanying exhibits, which also were received into the record at the second hearing.

At the second hearing, Mr. Albu again represented the Mesa Grande Band and Mr. Donald Proudfoot, an attorney in Long Beach, California, represented the Santa Ysabel Band. Mr. Proudfoot did not offer any witnesses nor documentary evidence. He relied solely on cross-examination of Dr. Bean and upon examination of the exhibits in his effort to establish that the Santa Ysabel Band should have received, as it did, patents to all three tracts and that such Band is the rightful beneficial owner of all three tracts.

Since the Santa Ysabel Band did not offer any evidence, it must be determined whether the evidence offered by Mesa Grande is sufficient to warrant findings of fact in its favor or if the cross-examination of Dr. Bean and the questioning of exhibits so weakened the credibility of the evidence offered by Mesa Grande as to negate a favorable ruling for Mesa Grande on the paramount issue hereinafter discussed.

## SCOPE OF INVESTIGATION BY LOWELL BEAN AND INQUIRIES POSED BY THE BUREAU OF INDIAN AFFAIRS

In an effort to resolve the controvery, the Bureau of Indian Affairs employed Dr. Bean, who, in a written report (Exhibit 64), stated his mission as follows:

To develop and prepare findings of fact concerning the historic relationship of the Mesa Grande and Santa Ysabel bands of Mission Indians of California and their respective use and occupancy of certain tracts of land and to present expert testimony at any hearings conducted on this matter.

Under the terms of the contract of employment, Dr. Bean was commissioned to do the following work:

From all available records and documentation, to develop a general history of both the Santa Ysabel and Mesa Grande Bands of Mission Indians, specifically addressing and providing findings on the following:

1. What is the general history of the Santa Ysabel and Mesa Grande Bands?

2. When did each emerge as an identifiable group within the larger Diaguenos group of Mission Indians, which is one of the four tribal divisions within the Mission Indians?

3. Were the Bands known by other names before assuming those of Spanish origin?

4. Were the Mesa grande and Santa Ysabel Bands distinct Bands in 1893?

5. How many members did each band have during the period 1876 to 1893?

6. What is the historic relationship between the two bands?

7. Who occupied and used each of the three tracts officially patented to the Santa Ysabel Band in 1893?

8. Who occupied and used the tract officially patented to the Mesa Grande Band in 1893?

9. What is the history of the administration of Indian programs by the Bureau of Indian Affairs for the two Bands?

10. Did the patents issued in 1893 reflect the intent and recommendation of the Smiley Commission?

Review of the record leads this Administrative Law Judge to conclude that testimony and exhibits elicited under inquiries numbered 4, 7, and 10 are most relevant and material to the paramount issue herein stated.

PARAMOUNT ISSUE, CONCLUSIONS BASED
ON THE RECORD, RECOMMENDED FINDINGS
OF FACT, AND SPECIAL FINDING OF FACT
AND CONCLUSION

## PARAMOUNT ISSUE

The paramount issue is whether the three tracts of land should have been patented to the Santa Ysabel Band or whether Tract 3 should have been patented to Santa Ysabel Band and Tracts 1 and 2 patented to the people occupying such tracts as of the date of issuance of the patent in 1893. It is claimed that the people occupying Tracts 1 and 2 at such time were the Mesa Grande Band of Mission Indians.

The contention of the Mesa Grande Band is that the intent of the Act for the Relief of Mission Indians in California, supra and the intent and recommendation of the Smiley Commission were not followed because all three tracts were patented to the Santa Ysabel Band. At the outset, it is clear that the intent and recommendation of the Smiley Commission were met. The commission recommended that all three tracts be patented to the Santa Ysabel Band and this recommendation was carried to fruition. It was admitted at the second hearing that the Smiley Commission did not err in its recommendation that all three tracts be patented to the Santa Ysabel Band (Tr. 118-120).

Concerning the contention that the intent of the Act was not fulfilled, Section 2 of the Act directed the commissioners to "select a reservation for each band or village of Mission Indians . . ., which reservation shall include, as far as practicable, the lands and villages which have been in the actual possession of said Indians" and Section 3 directed the Secretary of the Interior to "cause to issue for each of the reservations selected . . . in favor of each band or village of Indians occupying such

reservation."

Therefore, the thrust of the argument presented by the Mesa Grande Band is that before, during, and after the investigation by the Commission, its recommendations, and issuance of the patent, the Band was a separate and distinct Band of Mission Indians distinguishable from the Santa Ysabel Band, and thus, since the people of the Mesa Grande Band were occupying Tracts 1 and 2, patent to these tracts should have been issued to the Mesa Grande Band and not the Santa Ysabel Band.

Understated, the status of Mesa Grande throughout BIA administration of the area has been confusing. Indian agents and other representatives of the Government, as well as other individuals, have referred to the three tracts in various ways over a long period of time, and the exhibits in the record eloquently reflect this confusion.

In fact, the whole record is replete with contradictory documentation. Review of the record discloses that the following exhibits were questioned by Mr. Proudfoot:

    Exhibits Nos. 10, 12, 13, 17, 20, 22, 26, 27, 30, 31, 32, 33, 39, 40, 42, 43, 44, 45, 46, 47, 48, 49, 56, 57, 61, 62, and 64.

Many of these exhibits lent themselves to more than one interpretation, and it is questionable in a given instance whether a particular interpretation might be more favorable to or disputive of the position taken by Mesa Grande. Dr. Bean made interpretations of and conclusions from most of these exhibits and from other exhibits of record. However, in many instances the conclusions made by Dr. Bean did not appear to be warranted by the evidence in the record, and much of the evidence cited as supportive of a particular conclusion he may have drawn could have been cited, as readily,

as a basis for a conclusion contra to the position advanced by the Mesa Grande Band.

While it might be argued that the Mesa Grande Band resolved the paramount issue in its favor by a preponderance of the evidence, the standard of proof here involved is of a higher order, in the opinion of this Administrative Law Judge. The socio-economic implications of this controversy require that the burden of proof imposed on the Mesa Grande Band be that of clear and convincing proof.

This finding is supported by the principle enunciated in 32A C.J.S. Evidence §1023 (1964), which reads as follows:

> In ordinary civil actions a fact in issue is, as shown supra §1020, sufficiently proved by a preponderance of evidence. However, clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, as where this high standard is required to sustain claims which have serious social consequences or harsh or far-reaching effects on individuals, to prove willful, wrongful, and unlawful acts, to justify an exceptional judicial remedy, or to circumvent established legal safeguards, or in the case of claims evidenced merely by the oral testimony of interested witnesses as to events long past. Instruments which have established legal rights and warrant great reliance may not be contradicted, except by this degree of proof.

A review of the record conclusively establishes that the Mesa Grande Band did not discharge its burden of clear and convincing proof that patents to Tracts 1 and 2 should have been issued to it rather than the Santa Ysabel Band.

## CONCLUSIONS

Review of the whole record leads to the following conclusions:

1. That there is evidence of record which tends to establish that historically there was a separation of the Mesa Grande and Santa Ysabel Bands

7

of Mission Indians, based on the parameters applied by anthropologists in determining whether groups of Indians are separate and distinct. These parameters were set forth by Dr. Bean in Exhibit No. 64.

2. That the Bureau of Indian Affairs in administering the affairs of these Indian groups generally recognized the separateness of the Mesa Grande and Santa Ysabel Bands prior to the year 1893, and thereafter continued to recognize and administratively treat the bands as separate entities until recent years.

3. That insofar as historical separation of the bands is concerned, the historical significance of separation may have been lost as of 1893 at the time of issuance of the patent. This is evidenced by the following testimony (Tr. 2/4/75 hearing, pp. 27, 28):

(PROUDFOOT) The point I'm making--to see if I understand what you have told us--is that we can essentially disregard that portion of your testimony in report (sic) that relates to the people who traveled from the Pamo area to Mesa Grande as opposed to Santa Ysabel, and the references to Dr. Waterman, and different rituals, and the reference of that sort, because by the time it was critical we had people whose names were associated with both areas interchanged, and that the question is political autonomy in the 1891-1893 area, not which Indians aboriginally traveled in which area, is that correct.

(BEAN) If the legal question has to do with who was occupying the lands in 1891 rather than previously, that's correct.

However, Dr. Bean also testified that he considered Mesa Grande a separate political unit (Tr. 2/4/75, p. 103).

4. That further evidence that the separateness of the bands may have disappeared after 1891, except for Bureau and some anthropologic recognition of separateness, is the fact the record reflects (Exhibits 43 and 45) that in 1906 there was a census of the Indians living on Santa Ysabel Tract No. 3 and a census of the Indians living on Santa Ysabel

8

Tract No. 2 which discloses that many surnames listed on the census covering Tract 3 were also listed on the census covering Tract No. 2 (Tr. 2/4/75 hearing, p. 22). Since these censuses were taken about fifteen years after the Smiley Commission performed its work, it may well be presumed that the majority of the persons then found residing on Tracts 2 and 3 were residing at such locations as of the time that the Smiley Commission made its investigation.

5. That there is a paucity of evidence as to the criteria which the Smiley Commission applied in making its recommendation that all three tracts be patented to the Santa Ysabel Band of Mission Indians. Obviously, many of the exhibits are documents which were in existence prior to the Commission's investigation. The record is silent as to what, if any, documents the Commission reviewed prior to making its recommendations. However, the Commissioner of Indian Affairs charged the Commission members with the duty to make a thorough investigation (Exhibit 57). We must presume that the members of the Commission were conscientious men of honest intent and that they took their responsibility seriously. Some evidence that they did so is disclosed by Exhibits 27 and 56, and there is nothing in the hearing record to infer that the Commission's recommendations were improperly motivated.

The Commission made an on site investigation, and there is evidence of record tending to prove that there was considerable intermixing of the Indians living on Tracts 1, 2, and 3 at the time the Commission made its investigation. Therefore, it is a logical assumption that the Commission was made aware of the intermixture of peoples on these tracts at the time the investigation was made. In absence of evidence, it is an exercise

in surmise to assume that the Commission considered local relationships in its investigation; however, it is also an exercise in surmise, perhaps of less credibility, to assume that the Commission did not consider local relationships. In fact, Dr. Bean stated that he assumed the Smiley Commission knew the political groups and chose to put them under one patent (Tr. 2/4/75 hearing, p. 89). It is noted that "different socio-politico-economic units" is one of the criteria for separateness advanced by Dr. Bean (Exhibit No. 64).

I conclude that the evidence of record does not justify findings of fact which would, in effect, "second guess" the Smiley Commission several decades after it made its investigation and recommendations. This conclusion appears especially valid in the absence in the record of evidence disclosing the criteria used by the Commission in making its recommendation that all three tracts be patented to the Santa Ysabel Band.

## RECOMMENDED FINDINGS OF FACT

I make the following recommended findings of fact based on the whole record:

1. That the evidence of record, although mostly hearsay, tends to establish that, historically, there was a group of Indians which came to be known as Mesa Grande Indians and a group of Indians which came to be known as Santa Ysabel Indians, according to the parameters established by anthropologists for determining separateness between groups of Indians.

2. That the evidence in the record tends to establish that as of the period 1891-1893, separateness between these two groups of Indians had been diffused by intermixture of the two groups at least on

Tracts 2 and 3.

3. That the thrust of the evidence in the record is twofold: Evidence relating to parameters established by anthropologists to determine separateness, which parameters may have been inapplicable in the period 1891-1893, and evidence of the administration of the two bands by the Bureau of Indian Affairs.

4. That the evidence of record is conflicting as to whether, during the period 1891-1893, the Mesa Grande Band and the Santa Ysabel Band were separate entities within the intent and purpose of Sections 2 and 3 of the Act for the Relief of the Mission Indians in the State of California, supra.

5. That the serious socio-economic implication of the issue involved are such that a degree of proof higher than a mere preponderance of the evidence is required; that the degree of proof required is that of "clear and convincing" proof; and that Mesa Grande has not met this burden of proof.

6. That the evidence of record is not of sufficient quality to overcome the presumption, as evinced by the patent, that the Santa Ysabel Band is the rightful beneficial owner of the three tracts.

7. That since the Santa Ysabel Band has claimed, in effect, that Santa Ysabel and Mesa Grande Bands are not separate entities, a possible solution to the problem might be the creation of a new tribal structure encompassing the individuals living on all three tracts. Such new tribal structure should be one which would recognize the ownership rights of the persons now occupying the lands comprising each of the

three tracts, and it should give the occupants thereof rights of participation and representation in the new tribal structure.

8. That, in accordance with the special finding and conclusion herein made, the forum within which the Mesa Grande Band must seek relief is an appropriate federal district court and not through administrative action within the Department; except as the Department may take appropriate action pursuant to a ruling by the federal judiciary favorable to the Mesa Grande Band.

## SPECIAL FINDING AND CONCLUSION

Research conducted by the undersigned subsequent to the hearings leads to the conclusion that resolution of the question whether patents covering Tracts 1 and 2 should have issued to the Mesa Grande Band rather than the Santa Ysabel Band lies within the federal court system rather than through administrative action in the Department.

This finding and conclusion is based on the decision in King v. McAndrews, et al.. 111 F. 860 (8th Cir. 1901) and supportive cases therein cited. In this case the following syllabi by the court appear to be most relevant to the controversy at hand. Syllabus 3, reads as follows:

> The test of jurisdiction is not a right decision, but the right to investigate, to make some decision, and to dispose of the land accordingly. Hence, in a case within its[1] jurisdiction, the patent is impervious to collateral attack for error of law committed by the department as for mistakes of fact.

Syllabus 4 of this case reads as follows:

> The remedy for errors of law, as well mistakes of fact, in the issue of a patent to land within the jurisdiction of the department, is a direct proceeding by bill in equity to correct

---

[1] Land Department as defined to include the Secretary of the Interior in Syllabus 1 of King v. McAndrews, et al.. supra.

therein, attention, is called to the following cases:

<u>United States</u> v. <u>Winona & St. P. R. Co. et al.</u>, 67 F. 948 (8th Cir. 1895); <u>Watson</u> v. <u>Bonfils,</u> 116 F. 163 (8th Cir. 1902); <u>Boyton, et al.</u> v. <u>Haggart et al.</u> and <u>Rozell, et al.</u> v. <u>Boyton et al.</u>, 120 F. 828, 829 (8th Cir. 1903); <u>Conkling Mining Co.</u> v. <u>Silver King Coalition Mines Co.</u>, 230 F. 558 (8th Cir. 1916), and cases therein cited; <u>United States v. Caster</u>, 271 F. 618, 619 (8th Cir. 1921); and <u>Hodgson</u> v. <u>Midwest Oil Co., et al.</u>, 297 F. 276 (D.C. Wyo. 1924).

At the second hearing, the attorneys were given fifteen days after the date of mailing of these recommended findings of fact within which to file exceptions to them, or, in the event such exceptions could not be filed within such time, the attorneys were given the right to request an extension of time for filing the exceptions.

Done at Sacramento, California, on February 6, 1976.

William E. Hammett
Administrative Law Judge

Mailed: February 6, 1976

By: _____

13