# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MESA GRANDE BAND OF MISSION INDIANS,    )
   )
                             *Plaintiff*,    )     Case No. 14-1051 L
   )     (Judge Charles F. Lettow)
           v.    )
   )
THE UNITED STATES,    )
   )
                       *Defendant*.    )
_____ )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS FOR LACK OF JURISDICTION

DERRIL B. JORDAN
JORDAN LAW OFFICES PLLC
1730 Rhode Island Ave. NW
Suite 501
Washington, D.C. 20036
Tel: (202) 223-0893
Fax: (202) 223-0894
djordan@dbjordanlaw.com

*Counsel for Plaintiff*
*Mesa Grande Band of Mission Indians*

March 3, 2015

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................................... 1

FACTUAL & LEGAL BACKGROUND .......................................................................... 2

ARGUMENT ............................................................................................................................... 7

I.     MESA GRANDE'S CLAIM IS NOT TIME BARRED .................................................. 7

     A.     All events fixing the Government's liability did not occur until 1980 .................... 9

     B.     Before 2010, Mesa Grande did not know, nor should it have known,
             that the Government had taken its 80 acres and given them to Santa Ysabel ........ 12

II.    MESA GRANDE HAS ESTABLISHED THAT IT WAS THE BENEFICIAL OWNER
      OF THE 1926 TRACT BEFORE 1980 ................................................................... 15

     A.     Standard of review under RCFC 12(b)(6) ................................................. 15

     B.     Congress conveyed beneficial ownership of the 1926 Tract
             to Mesa Grande upon the effective date of the 1926 Act ......................... 16

     C.     Property Rights in the 80-Acre Tract Vested in Mesa Grande
             upon Enactment of the 1926
Act     20

III.   ISSUE PRECLUSION DOES NOT PROHIBIT MESA GRANDE
      FROM ESTABLISHING THAT IT WAS THE BENEFICIAL
      OWNER OF THE 1926 TRACT PRIOR TO 1980 .............................................. 22

     A.     The issue of title to Tract 1 is different from the issue of title
             to the 1926 Tract ........................................................................................ 23

     B.     Title to Tract 1 was not at issue in the 1978 decision and
             therefore never litigated. ........................................................................... 24

     C.     The Quiet Title Act has no bearing on this action. ................................... 26

IV.   SANTA YSABEL IS NOT A REQUIRED PARTY. .......................................... 27

     A.     Santa Ysabel is not a required party under Rule 19(a) ............................. 28

     B.     This action can proceed "in equity and good conscience"
             Without Santa Ysabel ................................................................................ 33

CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Maritime Transp., Inc. v. United States*,
  870 F.2d 1559 (Fed. Cir. 1989)..................................................................................28

*Arakaki v. United States*, 62 Fed. Cl. 244 (2004)................................................................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................15

*Bakia v. County of Los Angeles,* 687 F.2d 299 (9th Cir. 1982) ....................................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................15

*Bourgeois v. United States*, 212 Ct. Cl. 32 (Ct. Cl. 1976) ...................................11, 26, 29, 22, 30

*Brown v. United States*, 42 Fed. Cl. 538 (1998) ..........................................................33

*Cambridge v. United States*, 558 F.3d 1331 (Fed. Cir. 2009) ..........................................15

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)....................................................................................17

*Copar Pumice Co. v. United States*, 112 Fed. Cl. 515 (2013) ........................................16

*Foster v. Hallco Mfg. Co.,* 947 F.2d 469 (Fed. Cir. 1991) ..............................................24

*Gerlach Livestock Co. v. United States*,
  111 Ct. Cl. 1 (1948); *aff'd,* 339 U.S. 725 (1950)........................................................10

*Gila Gin Co. v. United States*, 231 Cl. Ct. 1001 (1982) ................................................27

*Goodrich v. United States*, 434 F.3d 1329 (Fed. Cir. 2006) ............................................8

*Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011) ........................16, 7, 17, 9

*Hilkovsky v. United States*, 205 Ct. Cl. 460 (1974) ......................................................10

*Hopland Band of Pomo Indians v. United States,*
  855 F.2d 1573 (Fed. Cir. 1988)....................................................................................8

*In re Swanson*, 540 F.3d 1368 (Fed. Cir. 2008)..............................................................17

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Ingrum v. United States*, 560 F.3d 1311 (Fed. Cir. 2009 ) ...............................8, 9, 12, 13

*Janaskie v. United States,* 77 Fed. Cl. 654 (2007) ........................................................15

*Japanese War Notes Claimants Ass'n. v. United States*,
  373 F.2d 356, 178 Ct. Cl. 630 (Ct. Cl. 1967)...............................................................13

*John R. Sand & Gravel Co. v. United States,* 552 U.S. 130 (2008) ...............................8

*Jones v. Meehan*, 175 U.S. 1 (1899) ..............................................................................21

*Klamath Tribe Claims Comm. v. United States*,
  106 Fed. Cl. 87 (2012), *aff'd* 541 Fed. App'x 974 (Fed. Cir. 2013)...........................34

*Laguna Hermosa Corp. v. United States,* 671 F. 3d 1884 (Fed. Cir. 2012) .................22

*Makah v. Verity*, 910 F.2d 555 (9th Cir. 1990)..............................................................32

*Mars Inc. v. Nippon Conlux Kabushik-Kaisha*,
  58 F.3d 616 (Fed. Cir. 1995)........................................................................................23

*Menominee Indian Tribe v. Thompson,* 161 F.3d 449 (7th Cir. 1998) .........................16

*Menominee Tribe v. United States*, 391 U.S. 404 (1968) ..............................................21

*N. Alaska Environmental Center v. Hodel*, 803 F.2d 466 (9th Cir. 1986)....................29

*New Orleans Pub. Serv. v. United Gas Pipe Line Co.*,
  732 F.2d 452 (5th Cir. 1984) ........................................................................................28

*New York Indians v. United States*, 170 U.S. 1 (1898)..................................................21

*Nw. La. Fish & Game Pres. Comm'n v. United States*,
  446 F.3d 1285 (Fed Cir. 2006)......................................................................................11

*Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90 (1991)....................................10, 26, 27

*Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51 (2009).........................................12

*Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456 (9th Cir. 1994)..............................32, 27

*Ram Energy Inc. v. United States*, 94 Fed. Cl. 406 (2010).........................................13

*Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996) .............................................32

*Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*,
   94 F.3d 1407 (10th Cir. 1996) .................................................34

*Rosales v. United States*, 89 Fed. Cl. 565 (2009) ...................................................30, 32

*Rutherford v. Greene's Heirs*, 15 U.S. 196 (1817) .......................................................21

*Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001) .............................................32, 33

*Sebastian v. United States*, 185 F.3d 1368 (Fed. Cir. 1999)..........................................16

*Simons v. United States*, 74 Fed. Cl. 709 (2006) ...................................................23, 24

*Southwest Center for Biological Diversity v. Babbitt*,
   150 F.3d 1152 (9th Cir. 1998) .................................................32

*Stabilisierongfunds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*,
   647 F.2d 200 (D.C. Cir. 1981)...............................................28

*Taylor v. United States*, 303 F.3d 1357 (Fed. Cir. 2002) .......................................... 8

*Tee-Hit-Ton Indians v. United States,* 348 U.S. 272 (1955)...........................................20

*Terry v. United States,* 103 Fed. Cl. 645 (2012) .................................................16

*Trusted Integration, Inc. v. United States*, 659 F.3d 1159 (Fed. Cir. 2011)....................................8, 15

*United Keetoowah Band of Cherokee Indians v. United States*,
   480 F.3d 1318 (Fed. Cir. 2007) .................................................28, 29, 30, 31, 32, 33

*United Keetoowah Band of Cherokee Indians of Oklahoma v. United States*,
   67 Fed. Cl. 95 (2005) .................................................31

*United States v. Creek Nation*, 295 U.S. 103 (1935) ...................................................10

*Washington v. Daley*, 173 F.3d 1158, 1171 (9th Cir. 1999)........................................32

*Westlands Water Dist. v. United States*, 109 Fed. Cl. 177 (2013).........................................15, 16

*Wichita & Affiliated Tribes of Oklahoma v. Hodel*,
   788 F.2d 765 (D.C. Cir. 1986)...............................................33

# TABLE OF AUTHORITIES—Continued

Page(s)

*Williams v. Taylor*, 529 U.S. 420, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000) ...........................16

*Wolfchild v. United States*, 77 Fed. Cl. 22 (2007) ........................................................29

*Young Eng'rs v. United States Int'l Trade Comm'n,*
  721 F.2d 1305 (Fed. Cir. 1983).........................................................................23

*Xianli Zhang v. United States*, 640 F.3d 1358 (Fed. Cir. 2011) .............................................16, 17

*Yaist v. United States*, 228 Ct. Cl. 281 (Ct. Cl. 1981).............................................................10, 27

## STATUTES AND RULES

Act of May 10, 1926, 44 Stat. 496, ch. 280 ......................................................... *passim*

Southern California Indian Land Transfer Act,
  Act of November 1, 1988, Public Law 100-581, Title VII, 102 Stat. 2938, § 702.....................19

Quiet Title Act,
  28 U.S.C. § 2409a ............................................................................................26, 27

28 U.S.C. § 2501 ..................................................................................................8

RCFC 12(b)(1) ......................................................................................................8

RCFC 12(b)(6) ..........................................................................................15, 16, 19

RCFC 19 ................................................................................................27, 28, 29, 31

RCFC 19(a).............................................................................................28, 29. 33

RCFC 19(a)(2) ...................................................................................................28

RCFC 19(b)..........................................................................................................33

RCFC 24(a) ........................................................................................................28

Page(s)

**LEGISLATIVE, EXECUTIVE AND ADMINISTRATIVE MATERIALS**

S. REP. NO. 420 (1926) ..................................................................3

H.R. REP. NO. 894 (1926) ...............................................................3

H.R. REP. NO. 2503 (1952) .............................................................5

Exec. Order No. 4297 (Aug. 27, 1925)............................................ *passim*

**OTHER AUTHORITIES**

CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE: VOL. 18, § 4417 (2nd ed. 2002). ..............................................................23

COHEN'S HANDBOOK OF FEDERAL INDIAN 477(Nell Jessup Newton ed. 2012)............................21

FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW (1982 ed.)...............................................21

DAN B. DOBBS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION §§ 2.4(4) (abr. 2d ed. 1993) ..........................................................27

RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982) .................................................24

# LIST OF EXHIBITS

**Exhibit 1 -** Letter from Charles L. Ellis, Superintendent, Mission Indian Agency, to the Comm'r of Indian Affairs (June 1, 1925) ......................................................................................... 2, 16

**Exhibit 2 -** Letter from Hubert Work, Secretary of the Interior, to President Calvin Coolidge (Aug. 25, 1925) ...................................................................................................................... 2, 16

**Exhibit 3 -** Exec. Order No. 4297 (Aug. 27, 1925) ........................................................... *passim*

**Exhibit 4 -** Letter from Charles H. Burke, Comm'r of Indian Affairs, to Charles L. Ellis, Superintendent, Mission Indian Agency (Dec. 14, 1925) ...................................................... 3, 16

**Exhibit 5 -** Letter from Charles L. Ellis, Superintendent, Mission Indian Agency, to Comm'r of Indian Affairs (Dec. 19, 1925) ....................................................................................... 3, 16

**Exhibit 6 -** S. REP. NO. 420 (1926) at 3, 4, 16 ................................................................ 3, 4, 16

**Exhibit 7 -** H.R. REP. NO. 894 (1926) ............................................................................ 3, 4, 16

**Exhibit 8 -** Act of May 10, 1926, Pub. L. No. 69–209, 44 Stat. 496 (1926) ........................... 4, 16, 20, 21

**Exhibit 9 -** Mission Indian Agency, California, *Narrative Report for the Fiscal Year 1937* ........ 16, 18, 19

**Exhibit 10 -** Letter from H.W. Gilmore, District Agent, to J.M. Stewart, Sacramento Area Office (September 1, 1950) ........................................................................................ 5, 16, 18, 19

**Exhibit 11 -** H.R. REP. NO. 2503 (1952) ...................................................................... 5, 16, 19

**Exhibit 12 -** Memorandum from Research and Reporting Section, to Chief, Branch of Tribal Services (May 3, 1960) .................................................................................... 5, 16, 19

**Exhibit 13 -** Letter from Frank Haggerty, Acting Area Field Representative, Riverside Area Field Office, to Area Realty Officer, Sacramento Area Office (Mar. 10, 1971) ............................................................................................... 5, 14, 16, 17

**Exhibit 14 -** Memorandum from William Finale, Area Dir., Sacramento Area Office, to William Gianelli, Realty Officer, Riverside Area Field Office (Mar. 24, 1971) .................................... 6, 14, 16, 17

**Exhibit 15 -** Letter from Acting Superintendent Frank Haggerty, to Sacramento Area Director (Feb. 26, 1980) ........................................................................................... 6, 16, 19

**Exhibit 16 -** *Decision of the Assistant Secretary of the Interior in the Matter of Beneficial Ownership Between the Mesa Grande and Santa Ysabel Bands of Mission Indians of Certain Reservation Lands* (Mar. 9, 1978) ..................................................... 6, 16, 19, 22

**Exhibit 17 -** Letter from William Finale, Area Director, to Director, Bureau of Land Management (June 11, 1980) ........................................................................ 7, 16, 22

**Exhibit 18 -** Bureau of Land Management, Patent Issued to the Santa Ysabel Band of

Mission Indians (July 30, 1980)...................................................................................... 7, 16, 19, 22

**Exhibit 19 -** Letter from Tomhave, Superintendent, to Scerato, Santa Ysabel Spokesman
(Aug. 22, 1980)............................................................................................................ 7, 16, 19, 22

**Exhibit 20 -** Act of November 1, 1988, Public Law 100-581, Title VII, 102 Stat. 2938, 2946–47,
§ 702(a) ............................................................................................................................... 16, 19

**Exhibit 21 -** Letter from Deputy Assistant Secretary of the Interior to Bessee [Jesse] Beresford)
(October 30, 1973) ................................................................................................................ 16, 23

**Exhibit 22 -** Memorandum to Director, Office of Hearings and Appeals, from Assistant to
 the Secretary for Indian Affairs (July 11, 1973) ................................................................... 16, 25

**Exhibit 23 -** *In the Matter of the Dispute Between the Mesa Grande and the*
*Santa Ysabel Bands* (Feb. 6, 1976) ...................................................................................... 16, 25

**INTRODUCTION**

In 1926, Congress conveyed property rights in 80 acres of public lands to the Mesa Grande Band of Mission Indians ("Mesa Grande" or "the Band").  In 1980, the Department of the Interior (the "Department" or "Interior") gave that land (the "1926 Tract") to another Indian Tribe.  This is a Fifth Amendment takings case seeking just compensation for the 1926 Tract, or, in the alternative, damages for breach of trust.  It is not, as Defendant asserts, an attempt by Mesa Grande to judicially reverse patents to different lands (Tracts 1 and 2) issued to the Iipay Nation of Santa Ysabel ("Santa Ysabel") in 1893 under the Mission Indian Relief Act.  (United States' Motion to Dismiss at 1 ("Def.Mot."))   A ruling that Mesa Grande possessed compensable property rights in the 1926 Tract would not implicate Santa Ysabel's title to the either the 1893 lands or its current title to the 1926 Tract.  No relief is sought from this Court concerning Tracts 1 and 2.

The events fixing the Government's liability did not occur until 1980.  But the Government did not notify Mesa Grande at the time and the Band was unaware of the patent to Santa Ysabel until 2010.  The claim's accrual date must therefore be suspended and the complaint was timely filed under the six-year statute of limitations.  The doctrine of issue preclusion is inapplicable because title to Tract 1 and the 1926 Tract are different issues.  The Band has stated a claim upon which relief can be granted because the undisputed facts show that it was the beneficial title holder of the 1926 Tract.  Because title to Tract 1 and the 1926 Tract are different issues, and the Band seeks no relief regarding Tract 1, Santa Ysabel is not an indispensable party.  There is no basis for dismissal of the Band's complaint.

**FACTUAL & LEGAL BACKGROUND**

In 1925, in the mountains northeast of San Diego, California, a non-Indian was threatening to fence off a spring that Mesa Grande had long used to water their stock. The spring was located on vacant government land just outside the small reservation's boundary. To protect that water source, the local Indian Affairs superintendent requested that the Commissioner of Indian Affairs have the land around the spring transferred from the General Land Office to the Office of Indian Affairs for "use of the Mesa Grande Indians." (Letter from Charles L. Ellis, Superintendent, Mission Indian Agency, to the Comm'r of Indian Affairs (June 1, 1925) (attached as Pl.'s Ex. 1.)) Ellis was the Department's representative on the ground who administered the Department's day-to-day responsibilities to the Mission Indians in southern California. He noted that the land contained a spring "which furnishes water to stock on the Mesa Grande Indian reservation," and that the "Indians have used it for years and consider it as theirs." He informed the Commissioner "that a white man is threatening to fence it up, and as the Indians are really entitled to it it is recommended it be set aside." (*Id.*)

Barely two months later, the Secretary of the Interior wrote to President Calvin Coolidge requesting that the 80-acre tract be temporarily withdrawn "as an additional reservation for the Mesa Grande Band." (Letter from Hubert Work, Secretary of the Interior, to President Calvin Coolidge (Aug. 25, 1925) (attached as Pl.'s Ex. 2.)) Based on the request from Superintendent Ellis, he informed the President that the land contained a spring necessary to water Mesa Grande's stock, and that the Band had used the land for many years and considered it their property. (*Id.* at 2). Two days later, President Coolidge signed an Executive Order temporarily reserving the 80-acre tract "for the use and benefit of the Indians of the Mesa Grande Indian

Reservation."  (Exec. Order No. 4297 (Aug. 27, 1925) ("1925 Executive Order," attached as Pl.'s Ex. 3.))

Before asking Congress to make the reservation permanent, however, the Office of Indian Affairs in Washington wanted to be sure that the withdrawal was in fact intended for the Mesa Grande Indians rather than the neighboring Santa Ysabel Indians.  (Letter from Charles H. Burke, Comm'r of Indian Affairs, to Charles L. Ellis, Superintendent, Mission Indian Agency (Dec. 14, 1925) (attached as Pl.'s Ex. 4.))  Somewhat confusingly, the land used and occupied by the Mesa Grande Band since time immemorial had been patented to the Santa Ysabel Band in 1893 and was designated in government-land records as Santa Ysabel Reservation No. 1.  After the central office noticed that the 80 acres was adjacent to that land, rather than another nearby tract that actually was patented to the Mesa Grande Band, the Commissioner asked the local superintendent to "show just how [the Mesa Grande Band] will be able to make use of it."  (*Id.*)  The Superintendent's prompt reply informed Commissioner Burke that "Santa Ysabel Reservation #1 is known locally as the Mesa Grande Reservation, and the Indians shown on the Census as Mesa Grande Indians are, in the main, occupants of this tract."  (Letter from Charles L. Ellis, Superintendent, Mission Indian Agency, to Comm'r of Indian Affairs (Dec. 19, 1925) (attached as Pl.'s Ex. 5.))

Less than one month later, Secretary Work sent to the chairmen of the Senate and House Committees on Indian Affairs a draft bill "to add an eighty acre tract of land . . . to the Mesa Grande Indian Reservation, known also as Santa Ysabel Reservation No. 1."  (S. REP. NO. 420 (1926) (attached as Pl.'s Ex. 6)); (H.R. REP. NO. 894 (1926) (attached as Pl.'s Ex. 7.))  He informed the Committees that:

> The superintendent of the Mission Indian Agency . . . reports that the land desired as an addition to the reservation is rough, rocky, and situated in a canyon, having but little

value except that there is a spring located thereon which furnishes water for the livestock belonging to the Indians. It is reported that the Indians have used this spring as a watering place for many years and regard it as their property.

. . .

If [this] legislation is not enacted . . . . it would be a very serious loss to the Indians if they should thereby lose possession of the spring.

Apparently based on Superintendent Ellis' explanation to Commissioner Burke that Mesa Grande actually occupied the "Santa Ysabel Reservation #1" and that it was "known locally as the Mesa Grande Reservation," Secretary Work stated that "[the 80 acres] adjoins land patented in trust in 1893 to that band of Indians under the provisions of the Act of January 12, 1891." (Pl.'s Exs. 6, 7.)

Relying solely on the Secretary's recommendation, Congress swiftly enacted Interior's stock-water-protection plan into law without amendment. *See* (Act of May 10, 1926, Pub. L. No. 69-209, 44 Stat. 496 (1926) ("1926 Act," attached as Pl.'s Ex. 8.)) Recognizing the urgency of the situation (the entire process took only 11 months), Congress provided that the land was "hereby withdrawn . . . and set apart and reserved," conveying an immediate interest and vesting a present property right to the 80 acres in the Band as of the Act's effective date.

For the next four decades, Interior reported that the 1926 Tract was part of the Mesa Grande Reservation. In 1937, the Mission Indian Agency Superintendent reported that the 1926 Tract was part of Mesa Grande Reservation, relying on the 1925 Executive Order. (Mission Indian Agency, California, *Narrative Report for the Fiscal Year 1937*, at 9. (attached as Pl.'s Ex. 9.)) In 1950, a District Agent informed the Sacramento Area Director of the Office of Indian Affairs (predecessor agency to the Bureau of Indian Affairs ("BIA")) that the legal authority for the creation of the Mesa Grande Reservation included, *inter alia*, the 1925 Executive Order.

(Letter from H.W. Gilmore, District Agent, to J.M. Stewart, Sacramento Area Office (September 1, 1950) (attached as Pl.'s Ex. 10.))

As part of a report to the House of Representatives in 1952, Interior also listed, *inter alia*, the 1925 Executive Order and the 1926 Act as legal authority for creation of the Mesa Grande Reservation. (H.R. REP. NO. 2503 at 8 (1952) (attached as Pl.'s Ex. 11.)) In 1960, the Research and Reporting Section of the BIA reported to the Chief, Branch of Tribal Programs that the Exec. Order of August 27, 1925 "temporarily set aside 80 acres of land" "for the Mesa Grande Band or Village of Indians" and that the 1926 Act "approved the withdrawal as made by" the 1925 Executive Order. (Memorandum from Research and Reporting Section, to Chief, Branch of Tribal Services, at 4 (May 3, 1960) (attached as Pl.'s Ex. 12.))

In 1971, the Acting Area Field Representative sent a memorandum to the Sacramento Area Realty Officer regarding the 1926 Tract. (Letter from Frank Haggerty, Acting Area Field Representative, Riverside Area Field Office, to Area Realty Officer, Sacramento Area Office (Mar. 10, 1971) (attached as Pl.'s Ex. 13.)) He referred to the 1925 Executive Order and the 1926 Act, and pointed out that "from the days of the establishment of the Santa Ysabel Reservation, the Mesa Grande Band has used Tracts 1 and 2." (*Id.*) He noted that the Mesa Grande Band believed that the 1926 Tract had been set aside for their use "since the Indians of the Mesa Grande Reservation, known also as Santa Ysabel Reservation Numbered 1", (sic) have always been members of the Mesa Grande Band."[1] (*Id.*) He opined that the 1926 Act "managed

---

[1] The memorandum says that Mesa Grande wanted the acreage of the 1926 Tract "added to their 120 acres and deleted from the acreage total of the Santa Ysabel Reservation." As discussed above, the BIA had included the 1926 Tract as part of the Mesa Grande Reservation at least until 1960, and Mesa Grande is unaware of any documents that show that the BIA ever considered that land as part of the Santa Ysabel Reservation. (Pl.'s Ex. 13.)

to confuse the issue by giving two names to the land," and concluded by asking for "clarification as to which reservation the parcel should be carried." (*Id.*)

The Area Director agreed that "the language of the act is confusing" and that the "80–acre parcel was set apart and reserved for the use and occupancy of the Mesa Grande Band of Indians." (Memorandum from William Finale, Area Dir., Sacramento Area Office, to William Gianelli, Realty Officer, Riverside Area Field Office (Mar. 24, 1971) (attached as Pl.'s Ex. 14.)) Nevertheless, he opined that the land was "definitely a part of the Santa Ysabel Reservation." (*Id.*) He stated further that it was the opinion of the Area Office that the title status of the 1926 Tract "should be resolved with the other portions of the reservation, known as Santa Ysabel No. 1 and Santa Ysabel No. 2, which have been used and occupied by the Mesa Grande Band of Mission Indians since time immemorial." (*Id.*)

The correspondence that led to patenting the 1926 Tract to Santa Ysabel began in February 1980, when Acting Superintendent Haggerty requested that a trust patent be issued to Santa Ysabel for that land. (Letter from Acting Superintendent Frank Haggerty, to Sacramento Area Director (Feb. 26, 1980) (attached as Pl.'s Ex. 15.)) Superintendent Haggerty cited the 1925 Executive Order as authority for the request, but he makes no mention of the 1926 Act, the Mission Indian Relief Act, or the *Decision of the Assistant Secretary of the Interior in the Matter of Beneficial Ownership Between the Mesa Grande and Santa Ysabel Bands of Mission Indians of Certain Reservation Lands* (Mar. 9, 1978) ("1978 decision," attached as Pl.'s Ex. 16.)) He acknowledges that the 1925 Executive Order "cites the land for the use and benefit of the Mesa Grande Reservation," but he also notes that Tract 1 was patented to Santa Ysabel in 1891. (Pl.'s Ex. 15.)

In apparent response to the Superintendent's request, the Sacramento Area Director sent a letter to the Director of the Sacramento office of the Bureau of Land Management ("BLM") asking that a patent for the land be issued to Santa Ysabel, citing the 1925 Executive Order and the Mission Indian Relief Act as authority for the request, but making no mention of the 1926 Act or the 1978 decision. (Letter from William Finale, Area Director, to Director, Bureau of Land Management (June 11, 1980) (attached as Pl.'s Ex. 17.)) A patent for the 1926 Tract was issued to Santa Ysabel on July 30, 1980, citing only the Mission Indian Relief Act as authority. (Bureau of Land Management, Patent Issued to the Santa Ysabel Band of Mission Indians (July 30, 1980) (attached as Pl.'s Ex. 18.)) The Agency then sent a copy of the patent to Santa Ysabel, informing the Band that "it is land already held by [Santa Ysabel] but was not covered by a trust patent before now." (Letter from Tomhave, Superintendent, to Scerato, Santa Ysabel Spokesman (Aug. 22, 1980) (attached as Pl.'s Ex. 19.)) It is undisputed that before 2010, Mesa Grande did not receive notice of the patent. *See* (Compl. ¶¶ 33–35.)

**ARGUMENT**

**I.     MESA GRANDE'S CLAIM IS NOT TIME BARRED**

In 1980, in direct contravention of Congress' will that the 1926 Tract be set aside for Mesa Grande's benefit, Interior flip-flopped and issued a patent declaring that the 80 acres will be held "in trust for the sole use and benefit of the Santa Ysabel Band of Mission Indians." (Pl.'s Ex. 18.) Interior did not notify the Mesa Grande Band of its action, and erroneously informed Santa Ysabel that "this is land already held by the [Santa Ysabel] Band but was not covered by a trust patent until now." (Pl.'s Ex. 19.) Mesa Grande did not learn of this until 2010, when the Government furnished documents in response to a Mesa Grande Freedom of Information Act request related to Tracts 1 and 2. It filed this action four years later.

The Government now argues that Mesa Grande's claim accrued no later than 1978 and is therefore barred by the 6-year limitations period in 28 U.S.C. § 2501.[2]  Because the 1926 Act links the 80 acres to Santa Ysabel No. 1 (Tract 1), and the Assistant Secretary's 1978 decision concerned the status of Tract 1, the Government asserts that the 1978 decision put Mesa Grande on inquiry notice that a possible claim was called for.  (Def.Mot. at 9.)

The rule is well established in this Court, however, that "a cause of action against the government has first accrued only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed. Cir. 1988) (emphasis in original; internal quotes omitted); *accord*, *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) ("[A] claim under the Fifth Amendment accrues when that taking action occurs . . . [but] only . . . if the claimant knew or should have known that the claim existed.") (internal quotes and citations omitted); *Ingrum v. United States*, 560 F.3d 1311, 1314– 15 (Fed. Cir. 2009) ("a claim alleging a Fifth Amendment taking accrues [only] when the act that constitutes the taking occurs . . . .  [and accrual will not be suspended unless] plaintiff . . . either show[s] that defendant has concealed its acts with the result that plaintiff was unaware of their

---

[2] The limitations period in 28 U.S.C. § 2501 is jurisdictional.  *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 136–39 (2008).  RCFC 12(b)(1) governs the dismissal of a claim for lack of subject-matter jurisdiction.  In ruling on a 12(b)(1) motion to dismiss, a court must accept as true all undisputed factual allegations in plaintiff's complaint and draw all reasonable inferences from those facts in the non-moving party's favor.  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002).  The court may consider evidence outside of the pleadings to determine its jurisdiction over a case. *Arakaki v. United States*, 62 Fed. Cl. 244, 247 (2004), *aff'd*, 228 Fed. App'x 1003 (Fed. Cir. 2007). In this context, Rule 12(b) will not operate to convert the dismissal motion to one for summary judgment under Rule 56.

existence or . . . that its injury was inherently unknowable at the time the cause of action accrued.")[3] (internal quotes and citations omitted).

The Government's argument that this claim accrued in 1978 fails both prongs of the claim-accrual rule—all events fixing the Government's liability had not occurred in 1978 and Mesa Grande did not know, nor should it have known, that the Government would give its land to Santa Ysabel.

A.      **All Events fixing the Government's liability did not occur until 1980.**

The Government cannot avoid the settled principles of takings jurisprudence by misstating the factual basis of Mesa Grande's claim. Contrary to the Government's assertion, the event that fixed the Government's liability was not "that the trust patent for the 1926 parcel was not issued in the name of [Mesa Grande]." (Def.Mot. at 8.) Rather, it was the affirmative act of issuing the patent to Santa Ysabel in 1980 that constituted the taking and fixed the Government's liability. (Compl. ¶ 31.)

By its terms, upon enactment the 1926 Act immediately created recognized Indian title, i.e., a Fifth Amendment-protected property right, in Mesa Grande. *See* discussion *infra* at 20–22. The 1926 Act was self-executing and did not depend on or direct any further action by the Department. Thus, any subsequent issuance of a patent reflecting *Mesa Grande's* beneficial title would have been a mere ministerial act undertaken for internal departmental purposes. The Government's failure over the decades to issue a patent in Mesa Grande's name does not violate

---

[3] The "concealed-or-inherently-unknowable" accrual-suspension standard is not meant to set forth a different test than the "knew-or-should-have-known" standard, and the two standards have been used interchangeably. *Ingrum*, 560 F.3d at 1315, n.1.

Congress' 1926 mandate and thus would not put Mesa Grande on notice that Interior would give its land to another tribe.[4]

The principle controlling whether and when a taking occurs was set forth in *Gerlach Livestock Co. v. United States*, 111 Ct. Cl. 1, 86 (1948); *aff'd*, 339 U.S. 725 (1950), where the Court of Claims explained that:

> the time of the taking . . . comes whenever the [United States'] intent to take has been definitely asserted and it begins to carry out that intent. So long as it is conjectural whether or not defendant will actually take plaintiff's property, a taking has not occurred, but when conjecture ripens into a definitely asserted purpose and steps are taken to carry out that purpose, the taking may be said to have occurred.

Government actions that fall short of actually transferring legal title have been held to not constitute takings. *See, e.g., Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 97 n.4 (1991) ("mere filing of [an erroneous survey,] a deed or plat [in the county courthouse] does not constitute a taking, since there is no direct interference with land") (citing *Gerlach*, 111 Ct. Cl. at 85–86); *Hilkovsky v. United States*, 205 Ct. Cl. 460, 464 (1974) ("[t]he mere description of [an] intended National Seashore by metes and boundaries in . . . [a] statute did not effect a taking by itself" where Congress never actually established the National Seashore); *cf. United States v. Creek Nation*, 295 U.S. 103, 111 (1935) (neither an erroneous survey nor its approval by Commissioner of the General Land Office effected any change in existing ownership, but disposal of land through issuance of patents—"the most accredited type of conveyance known to our law"—constituted a taking). In *Yaist v. United States*, the court stated that "[i]t is the interference with the title to the land through a legally authorized assertion of ownership that

---

[4] The Government's argument that Mesa Grande's receipt of notice in the late 1960s that Tract 1 was patented to Santa Ysabel would have served to put it "on notice that the 1926 Parcel may not have been patented in its name," (Def.Mot. at 10), like its argument in favor of a 1978 accrual date, completely misses the mark. Rather than a statute-of-limitations argument, it is essentially an argument that Mesa Grande never had a property interest to be taken.

constitutes the taking." 228 Ct. Cl. 281, 287 n.4 (1981). There, the Government expressed its intention to take property by filing its deed with the county records office and informing plaintiff in a letter that "the United States is the owner of record of the lands in question." *Id*. at 286; *see generally Bourgeois v. United States*, 212 Ct. Cl. 32 (1976) (issuance of an 1866 patent together with the Government's 1971 posting of the property as government land and its letter to plaintiff's attorney that year pronouncing the land to be federal land established a taking); *Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1289 (Fed Cir. 2006) ("A taking occurs when governmental action deprives the owner of all or most of its property interest.").

Here, property rights vested in the Mesa Grande Band on May 10, 1926 by specific congressional action. Interior took no action to violate Congress' will and deprive Mesa Grande of its property rights until July 30, 1980, when the BLM issued the patent to Santa Ysabel and shortly thereafter informed Santa Ysabel of the patent. The Government is therefore mistaken in its contention that the Assistant Secretary's 1978 letter provided Mesa Grande with all necessary information to bring this claim, or at a minimum, inquire into the status of the 80 acres. (Def.Mot. at 10.) The 1978 decision did not change anything with regard to the 80 acres. Neither the Assistant Secretary's 1978 decision nor the ALJ's 1976 recommendation even mentioned the 80-acre tract, the 1925 Executive Order or the 1926 Act. The Assistant Secretary's decision not to re-issue the Tract 1 patent in Mesa Grande's name and Mesa Grande's presumed awareness (since 1926) of the "statutory link," (Def.Mot. at 11), are of no consequence because, in 1926, Congress (and the Interior Secretary), believing the "Santa Ysabel Reservation Numbered 1" to be the Mesa Grande Reservation, conveyed the land to the

Mesa Grande Band.  The 1978 decision by itself, therefore, could not have undone what Congress did in 1926, nor did it purport to.[5]

**B.      Before 2010, Mesa Grande did not know, nor should it have known, that the Government had taken its 80 acres and given them to Santa Ysabel.**

The Government does not dispute that in 1980 it issued a patent to the 1926 Tract to Santa Ysabel.  (Compl. ¶ 31.)  Nor does it dispute that it notified Santa Ysabel of the patent in 1980, (*Id.* ¶ 32), that it did not provide Mesa Grande actual notice of the 1980 patent until November 2010, (*Id.* ¶ 34), and that Mesa Grande did not discover that the patent had issued until 2010.  (*Id.* ¶¶ 34, 35.)  Instead, it argues that the 1978 decision put Mesa Grande on notice that inquiry into a possible claim was called for.  (Def.Mot. at 9.)

Accrual of the claim must be suspended, however, because, in 1978, it was inherently unknowable that the BIA would patent the 80 acres to Santa Ysabel.  *See Ingrum v. United States*, 560 F.3d at 1314–15.  The 1978 decision did not mention the 80 acres or purport to affect its status in any way.  And if Mesa Grande had nonetheless inquired into the land's status in 1978 or 1979, it would have found nothing—no change since 1926 when Congress directed that the 80 acres be set aside for them, "the Indians of the Mesa Grande Reservation."

Of course, the claim had not accrued in 1978, and when the taking did occur in 1980, it was inherently unknowable because there was nothing *at that time* to alert Mesa Grande of the wrong.  *See Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 61–62 (2009) ("a claim is 'inherently unknowable' when there is nothing to alert one to the wrong at the time it occurs.")

---

[5] The fact that the ALJ did not find that the Smiley Commission erred in 1891 when it concluded that Tract 1 should be patented to Santa Ysabel is not determinative of Congress' intent in 1926. Neither the ALJ in 1976 nor the Assistant Secretary in 1978 addressed whether Congress intended the Mesa Grande Indians to be beneficial owners of the 1926 Tract.  See discussion *infra* at 24–25.

(quoting *Japanese War Notes Claimants Ass'n. v. United States*, 178 Ct. Cl. 630, 634 (Ct. Cl. 1967)); *accord, Ram Energy Inc. v. United States*, 94 Fed. Cl. 406, 411 (2010).

Accrual of the claim should also be suspended because BIA's failure to provide notice qualifies as a concealment that prevented the Band from knowing that it had a claim against the Government. *See Ingrum*, 560 F.3d at 1315. Thus, the "possibility of notice [was] foreclosed by . . . the complete absence of relevant evidence." *Ram Energy*, 94 Fed. Cl. at 411. That the 1978 decision addressed whether a mistake had been made in the patenting of Tracts 1 and 2 to Santa Ysabel does not mean that it addressed the status of all of Mesa Grande's lands. Indeed, the Band's claim regarding Tracts 1 and 2 was based on the Executive Order of 1875 and the Mission Indian Relief Act, whereas its claim to the 1926 Tract is based on the 1925 Executive Order and the 1926 Act. Moreover, because BIA had not addressed the status of the 120-acre tract patented to Mesa Grande alone in 1893, Mesa Grande was justified in relying on the 1926 Act's explicit language, the presumption that the BIA would not ignore or be unaware of the 1926 Act's provisions that it had caused to be enacted, and the BIA's knowledge that the Band claimed the 1926 Tract belonged to it. All of these factors together indicate that the Government concealed the issuance of the patent and that Mesa Grande's claim was inherently unknowable.

In addition, it appears that the Government's concealment may have been active and deliberate. In the 1974–75 hearings, the Band relied on the language of the 1926 Act reserving the land "for the occupancy and use of the Indians of the Mesa Grande Reservation, also known as Santa Ysabel Reservation Numbered 1" as proof that it, not Santa Ysabel, had historically occupied Tract 1. (Compl. ¶ 25.) Because the Band relied on the 1926 Act in its attempt to prove its claim regarding Tracts 1 and 2, the BIA was well aware that Mesa Grande asserted beneficial ownership of the 80 acres.

In the intra-agency discussion that took place in early 1971, Acting Area Field Representative Frank Haggerty, Jr., noted that "[t]he Mesa Grande Band feels the language of the Executive Order shows a clear intent that the land was withdrawn for them and not for the Santa Ysabel Band." (Pl.'s Ex. 13.) In his March 24, 1971 reply to Haggerty, Area Director Finale recognized that "the 80-acre parcel was set apart and reserved for the use and occupancy of the Mesa Grande Band of Mission Indians." (Pl.'s Ex. 14.) Yet in 1980, despite his own understanding that Congress had reserved the land for Mesa Grande and, more importantly, his knowledge that Mesa Grande claimed the 80 acres as its own pursuant to the 1926 Act, he failed to notify Mesa Grande of the issuance of the patent to Santa Ysabel. Given his familiarity with Mesa Grande's claim that it owned the 80 acres, Area Director Finale's failure to provide notice to Mesa Grande can be understood as a deliberate concealment from Mesa Grande of the patent to Santa Ysabel—perhaps, we may speculate, in an effort to "let sleeping dogs lie" and not stir up another land dispute involving Mesa Grande and Santa Ysabel.

That the claim was otherwise inherently unknowable is strongly supported by several factors. First, even if Mesa Grande members were visiting the tract regularly, there would almost certainly have been nothing to alert them that a patent had been issued to Santa Ysabel. There is no evidence that BIA or Santa Ysabel posted a notice on the tract. (Compl. ¶ 36.) In addition, the purpose for which the 80 acres was reserved and the nature and location of the tract itself strongly support inherent unknowability. The land was described as being "rough, rocky, and in a canyon," reserved in 1926 because it contained a spring "which furnishes water to stock on the Mesa Grande Indian reservation." (*Id.* ¶¶ 38–39.) By 1980, however, Mesa Grande and its members had not raised livestock for several decades. (*Id.* ¶ 39.) The Band therefore would have had no occasion to visit the land to tend to livestock and thereby *perhaps* discover that it

had been patented to Santa Ysabel. Moreover, there is no record of any Mesa Grande member ever living on the land. (*Id.* ¶ 41.) The property is isolated and not accessible by any roadway. Access from Tract 1 is only by foot over extremely rough terrain. (*Id.* ¶ 40.) Given the tract's remote, inaccessible location, that no one in historical times has lived there, that its economic/subsistence usefulness to the Band and its members ceased well before 1980, and the fact that a visit to the tract almost certainly would not have provided any indication that it had been patented to Santa Ysabel, the facts giving rise to the claim were "inherently unknowable."

## II.     MESA GRANDE HAS ESTABLISHED THAT IT WAS THE BENEFICIAL OWNER OF THE 1926 TRACT BEFORE 1980

The Government's motion to dismiss for failure to state a claim must be denied because Congress conveyed beneficial ownership in the 80 acres to Mesa Grande upon the effective date of the 1926 Act. (Def.Mot. at 12.)

### A.     Standard of review under RCFC 12(b)(6)

Dismissal under RCFC 12(b)(6) is improper if a complaint contains facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, the court "must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009). All reasonable inferences should be drawn in the plaintiff's favor. *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 190 (2013) (citing *Trusted Integration, Inc.*, 659 F.3d at 1163). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Janaskie v. United States,* 77 Fed. Cl. 654, 657 (2007).

In considering a motion under RCFC 12(b)(6), a court may "properly consider allegations in the complaint, exhibits attached to the complaint, and public record materials." *Copar Pumice Co. v. United States*, 112 Fed. Cl. 515, 527 (2013). A court must also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Westlands Water Dist.*, 109 Fed. Cl. at 190. Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper. *Menominee Indian Tribe v. Thompson,* 161 F.3d 449, 456 (7th Cir. 1998). This Court may consider the Band's exhibits and need not convert this into a motion for summary judgment.[6] *Terry v. United States,* 103 Fed. Cl. 645, 652 (2012) (citing *Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999)).

**B.    Congress conveyed beneficial ownership of the 1926 Tract to Mesa Grande upon the effective date of the 1926 Act.**

While its legislative history and surrounding circumstances leave no doubt that the 1926 Act was intended to benefit Mesa Grande, the canons of statutory construction require that the inquiry into Congress' intent must begin with the language of the statute itself.[7] The Act of May 10, 1926, 44 Stat. 496, ch. 280 (Pl.'s Ex. 11) provides:

---

[6] Pl.'s Exs. 1–5, 8, 15–16, and 18–19, are referenced in the Complaint and also qualify for judicial notice as historical documents and documents contained in the public record. Pl.'s Exs. 6–7, 9–14, 17, and 20–23 qualify for judicial notice as either historical documents, documents contained in the public record, or administrative agency reports.

[7] *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("When interpreting a statute, we start with the language of the statute itself."); *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368, 1376 (Fed. Cir. 2011) ("The search for Congress's intent begins with the plain statutory text"), *vacated and remanded on other grounds*, 132 S. Ct. 2099 (2012). The first step is to ask "whether the statute's plain terms directly address the precise question at issue." *Xianli Zhang*, 640 F.3d at 1376. The words of a statute are given "'their 'ordinary, contemporary, common meaning,'" unless there is "an indication Congress intended them to bear some different import." *Id.* at 1364 (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000)). "[I]nternal inconsistencies in the statute must be dealt with." *Id.* (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)).

> That there is hereby withdrawn . . . and set apart and reserved for the occupancy and use of the Indians of the Mesa Grande Reservation, known also as Santa Ysabel Reservation Numbered 1, a tract of land . . . containing eighty acres, the same to be added to and become part of said Indian reservation.

Although the Government pretends that this is a clear statement that the 1926 Tract was intended for Santa Ysabel's benefit, (Def.Mot. at 9), it is plain that the statute is ambiguous on its face.[8] Reading the statute in isolation raises the question whether the land is "to be added to and become a part of" which reservation: the Mesa Grande Reservation or the Santa Ysabel Reservation Numbered 1? The question cannot be answered by reference to the statutory language alone; and it is elementary that, if Congress' intent remains unclear after review of the statutory text, courts must turn to legislative history and surrounding circumstances to determine congressional intent.[9]

Here, the legislative history of 1926 Act, together with the facts and circumstances surrounding its enactment, establish with certainty that Congress intended the Mesa Grande band to be the beneficial owner of the 1926 Tract. The process that culminated in the 1926 Act began eleven months earlier with a request from the local Indian superintendent. His June 1925 letter requested that 80 acres be set aside for the "use of the Mesa Grande Indians" because it contained a spring they had long used to water their livestock and a white man was threatening to fence it off. Promptly after the Secretary asked the President to set the land aside as "an

---

[8] The ambiguity was created by Interior itself. In 1971, the same BIA officials who caused BLM to issue a patent to Santa Ysabel in 1980 noted that the 1926 Act "managed to confuse the issue by giving two names to the land," (Pl.'s Ex. 13), and that "the language of the act is confusing." (Pl.'s Ex. 14.) Moreover, Defendant admits that the reference to Tract 1 is confusing. (Def.Mot. at 4.)

[9] *See Grapevine Imps.* at 1376 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); see also *Xianli Zhang* at 1364 ("[w]hen the statutory language is ambiguous, legislative history can illuminate Congress's intent." It is also appropriate to look to the legislative history if "the text itself does not clearly exclude alternate interpretations."); *In re Swanson*, 540 F.3d 1368, 1376 (Fed. Cir. 2008).

additional reservation for the Mesa Grande Band," the President signed an executive order reserving the land "for the use and benefit of the Indians of the Mesa Grande Reservation." Then, after confirming that the land was indeed going to be used by Mesa Grande and not Santa Ysabel, the Secretary submitted proposed legislation to the House and Senate Indian Affairs Committees. *See* discussion *supra* at 1–4.

The Secretary requested that Congress "add an 80-acre tract . . . to the Mesa Grande Indian Reservation, known also as Santa Ysabel Reservation No. 1," and mistakenly informed Congress that "the tract adjoins land patented in trust to that band of Indians under [the Mission Indian Relief Act]."[10] But the fact that the Secretary was confused about the title status of the adjoining land does not diminish the clarity of the Department's intent that the land be withdrawn for Mesa Grande's benefit. The Secretary's letter leaves no doubt that the purpose of the draft bill the Department proposed to Congress was to implement the superintendent's plan to protect the Mesa Grande Indians' watering place by reserving land they regarded as their property. (Pl.'s Exs. 9, 10); *see* discussion *supra* at 1–4.[11]

The Secretary's submittal letter is reproduced in full in both the Senate and House Committee reports and constitutes the entirety of both Committees' statements of congressional findings and purpose. There is no indication whatsoever in either committee report that Congress intended to alter in the slightest the Department's plan to permanently set the tract

---

[10] Although Tract 1 had in fact been patented to Santa Ysabel, given Superintendent Ellis' assurance that Mesa Grande would be able to use the 80 acres because it actually occupied Tract 1, it is not surprising that the Secretary told Congress that Tract 1 had been patented to Mesa Grande.

[11] These facts are not only unchallenged by the Government, it admits that the 1925 Executive Order set the land aside "for the use and benefit of the Indians of the Mesa Grande Indian Reservation," (Def.Mot. at 3), and that the 1926 Act withdrew the land for the occupancy and use of the "Indians of the Mesa Grande Reservation." (Def.Mot. at 4.)

aside for the Mesa Grande Indians. (Pl.'s Ex. 6, 7). Indeed, Congress enacted the bill drafted and proposed by the Department without amendment.[12] There can be no doubt that Congress, despite its mistaken understanding of the adjacent land's title status, intended to convey beneficial ownership of the 1926 Tract to the Mesa Grande Band.[13]

Moreover, for decades Interior acted consistently with its 1926 representations to Congress that Mesa Grande was the beneficial owner of the 1926 Tract, continually reporting that the 1926 Tract was part of the Mesa Grande Reservation from at least 1937 to 1960. *See* (Pl.'s Exs. 9–12.) Even when the BIA began the process that led to the 1980 patent, it acknowledged that the 1925 Executive Order "cites the land for the use and benefit of the Mesa Grande Reservation." Nonetheless, the Sacramento Area Office ignored the longstanding practice of holding and administering the land on behalf of Mesa Grande, and proceeded to issue the patent to Santa Ysabel. *See* (Pl.'s Exs. 15–16, 18–19.)

The complaint's undisputed allegations together with the attached exhibits plainly exceed the standards for defeating the Government's 12(b)(6) challenge. Defendant's motion to dismiss for failure to state a claim must be denied.

---

[12] It is ironic that the Department now argues that the 1926 Act was intended to benefit Santa Ysabel when it is clear that it was Interior's intent from the beginning that the 80 acres be set aside for Mesa Grande, and that Congress, acting on Interior's recommendation, had the exact same objective.

[13] In 1988, Congress again misidentified Tract 1 as the Mesa Grande Reservation. In the Southern California Indian Land Transfer Act, it transferred several thousand acres of BLM land to "be a part of" the "adjacent" reservations of 10 Mission Indian tribes. (Act of November 1, 1988, Public Law 100-581, Title VII, 102 Stat. 2938, 2946–47, § 702(a) (attached as Pl.'s Ex. 20.)) In section 702(b)(1), Congress expressly identifies the "Mesa Grande Band" as the Band for which 800 acres are to be held in trust. It then expressly identifies "Mesa Grande" as the adjacent reservation that the BLM lands are to be a part of. But, like the 1926 Tract, the 800 acres are immediately adjacent to Tract 1. By the logic of Defendant's reasoning regarding the 1926 Tract, Santa Ysabel would also be the beneficial owner of the 800 acres because Congress mistakenly believed Tract 1 to be the Mesa Grande Reservation, despite the Congress' explicit direction that the lands be held in trust for Mesa Grande's benefit.

**C.      Property rights in the 80-acre tract vested in Mesa Grande upon enactment of the 1926 Act.**

The Government does not seriously contest that when Congress enacted the 1926 Act, it conveyed an immediate property interest in the 80 acres.  Instead, it contends that, because the beneficial interest in the 1926 Tract is determined by the fact that Santa Ysabel holds the patent to Tract 1, it does not matter whether the beneficial interest in the 80 acres vested upon the effective date of the 1926 Act or the 1980 patent to Santa Ysabel.  (Def.Mot. at 12–13.)  But, because the Government is mistaken about which Band Congress intended should possess the beneficial interest in the 1926 Tract, it matters a great deal whether the right vested in 1926 or 1980.  Mesa Grande has demonstrated that Congress intended to convey the beneficial interest in the 1926 Tract to it, but to establish an element essential to its takings and breach-of-trust claims—possession of a property right—it must also show that Congress intended an immediate conveyance.  (Compl. ¶ 18.)

That property rights vested in the Band upon enactment of the 1926 Act is established by the language of the 1926 Act itself.  Congress stated directly that the 1926 Tract was "*hereby withdrawn* from settlement, entry or disposition under the laws of the United States *and set apart and reserved* for the *occupancy and use* of the Indians of the Mesa Grande Reservation." (Emphasis added.) (Pl.'s Ex. 8.)

It is a cardinal rule of federal Indian law that the declaration of permanent possessory rights creates recognized Indian title.  *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 277–78 (1955).

> So long as a treaty purports to recognize Indian title or permanent rights to particularly described land it creates a recognized Indian title.  Accordingly, phrases in treaty grants such as "use and occupancy" . . . do not refer to original Indian title but are held to vest recognized and enforceable property rights in the tribes.

FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 476 (1982 ed.) (citing *Menominee Tribe v. United States*, 391 U.S. 404 (1968)). Since the end of the treaty-making period in 1871, recognized and enforceable tribal property rights have been created by statute.

> Perhaps the most common type of . . . legislation [establishing Indian reservations] reserves a portion of the public domain from entry or sale and dedicates the area to Indian use. The designated area is "set aside" or "reserved" for a given tribe, band or group of Indians.

COHEN'S HANDBOOK AT 477; *accord* 2012 ed. § 1504[3][b] at 1008.

The 1926 Act was not merely an executory promise to convey a property right in the future, but instead was intended to vest a present legal title in Mesa Grande. The Act states plainly that the 80–acre tract "is hereby set apart and reserved for the occupancy and use of the Indians of the Mesa Grande Reservation." In *New York Indians v. United States*, the Court held that the United States' agreement in a treaty to "set apart" certain described lands "as a permanent home . . . by a patent from the president of the United States," was a grant in *praesenti* and conveyed an immediate interest even though the Indians never occupied the land and a patent never issued.[14] 170 U.S. 1, 15 (1898), *amended by* 170 U.S. 614 (1898); *accord Jones v. Meehan*, 175 U.S. 1, 21 (1899).

Both *New York Indians* and *Jones v. Meehan,* as well as the abundant authorities on which they rely, show that language such as that contained in the 1926 Act has on numerous occasions been held to convey a present interest. These authorities also require courts to

---

[14] The Court relied on *Rutherford v. Greene's Heirs*, where statutory language providing that land "shall be allotted for and given to Major-General Nathaniel Greene . . . to be laid off by . . . commissioners [with certificates then to issue]" was held to convey a present interest. 15 U.S. 196, 197 (1817). Chief Justice Marshall rejected the argument that the words "are hereby given" were necessary to effectuate a present conveyance, observing that the validity of a legislative act does not depend "on its containing the technical terms used in a conveyance." *New York Indians*, 170 U.S at 16. In Mesa Grande's case, technical, present-tense conveyance terms are used in the statute—the 80 acres "is hereby . . . reserved." (Pl.'s Ex. 8.)

consider context and circumstances when determining whether Congress intended to convey a present interest in lands. Here, the statutory language as well as the legislative history and circumstances surrounding the 1926 Act demonstrate that both Congress and Interior intended an immediate conveyance, seeking to ensure that land and water that Mesa Grande members had long been using and believed was theirs would immediately be secured to them to prevent a non-Indian from fencing off the area for his own use. The BIA's practice of reporting the 1926 Tract as belonging to Mesa Grande (Pl.'s Exs. 16–19) further suggests that the BIA understood the 1926 Act to convey an immediate property interest. The Government's unsupported assertion that the 1926 Act did not convey an immediate property interest is wrong as a matter of law and fact.

## III. ISSUE PRECLUSION DOES NOT PROHIBIT MESA GRANDE FROM ESTABLISHING THAT IT WAS THE BENEFICIAL OWNER OF THE 1926 TRACT PRIOR TO 1980

Four factors must be present for issue preclusion to apply: (1) the issues are identical to those in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full-and-fair opportunity to litigate the issues. *Laguna Hermosa Corp. v. United States*, 671 F. 3d 1284, 1288 (Fed. Cir. 2012). Defendant's assertion that Mesa Grande is precluded from arguing that it was the intended beneficial owner of the 1926 Tract rests on two flawed assumptions: (1) that title to Tract 1 is the same issue as title to the 1926 Tract; and (2) that the 1978 decision decided title to Tract 1.[15]

---

[15] Defendant mistakenly asserts that the Department's Office of Hearings and Appeals ("OHA") was acting in a judicial capacity in the context of the 1978 decision and that the Band had a full-and-fair opportunity to litigate the issue. (Def.Mot. at 15.) However, the ALJ's 1976 decision was not an adjudication because the Secretary reserved the authority to make the ultimate decision. When OHA is adjudicating, the Secretary does not retain any authority and OHA's

**A.**    **The issue of title to Tract 1 is different from the issue of title to the 1926 Tract.**

In order for issue preclusion to apply, the issue presented in this case must be identical to the issue decided in the 1978 decision. Plainly it is not. Tract 1 and the 1926 Tract are two distinct tracts of land. The legal authorities for the Tract 1 title are the 1875 Executive Order and the Mission Indian Relief Act of 1891. In contrast, the legal authorities for title to the 1926 Tract are the 1925 Executive Order and the 1926 Act. In addition, the historical facts leading to enactment of the Mission Indian Relief Act in 1891 differ from the historical facts surrounding enactment of the 1926 Act. "Clear separations of fact or clear distinctions of applicable law generate different issues, free from preclusion." CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE: DEFINING THE ISSUE PRECLUDED, VOL. 18, § 4417 (2nd ed. 2002).

The Federal Circuit has adopted the transactional test for determining whether the same cause of action is asserted in two lawsuits. *Simons v. United States*, 74 Fed. Cl. 709, 714 (2006) (citing *Young Eng'rs v. United States Int'l Trade Comm'n,* 721 F.2d 1305, 1314 (Fed. Cir. 1983); *Mars Inc. v. Nippon Conlux Kabushik-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995)). In the *res judicata* context, claim "does not mean merely argument or assertion," but rather "is used in

---

decision is final for the Department. See 43 C.F.R. §§ 4.1, 4.21(c) (1975). Moreover, even if the process did qualify as an adjudication, and it were assumed *arguendo* that title to Tract 1 was at issue, that issue was not actually litigated nor was it necessary to the judgment because it was concluded that the Department lacked subject-matter jurisdiction to correct the Santa Ysabel patent. Finally, Mesa Grande did not have a full-and-fair opportunity to litigate its claims in the process that led to the 1978 decision because the Department expanded the scope and purpose of the hearings, from mere fact-finding to making the ultimate decision, even though Mesa Grande was informed that the Secretary, not the ALJ, would decide whether a mistake had been made and, if so, what to do about it. See (Letter from Deputy Assistant Secretary of the Interior to Bessee [Jesse] Beresford) (October 30, 1973) (attached as Pl.'s Ex. 21.)

the same sense of facts giving rise to the suit."[16]  *Simons*, 74 Fed. Cl. at 714 (internal quotes omitted) (citing *Foster v. Hallco Mfg. Co.,* 947 F.2d 469, 478–79 (Fed. Cir. 1991) (citing RESTATEMENT § 24)).  If the issues arise from different transactions and operative facts—here executive orders issued 50 years apart and statutes enacted 35 years apart—and involve distinct tracts of land, the issues cannot be said to be identical.[17]  Finally, because title to Tract 1 is a different issue than title to the 1926 Tract, the ALJ's implicit rejection of the Band's argument that the 1926 Act demonstrated that a mistake had been made in the patenting of Tract 1 to Santa Ysabel does not mean that the 1926 Act did not convey title to the 80 acres to Mesa Grande.

**B.     Title to Tract 1 Was Not at Issue in the 1978 Decision and Therefore Never Litigated.**

The Government's argument that the Band is precluded from arguing that it was the intended beneficial owner of the 1926 Tract is also based on the erroneous assumption that title to Tract 1 was an issue decided by the 1978 decision.  Referring to the 1978 decision, Defendant argues that "[t]o prove that it had a property interest in the 1926 Parcel, the Mesa Grande Band would need to demonstrate that it . . . should have been the patent recipient for Santa Ysabel Tract One," "[b]ut that question has already been decided against the Band . . . ."  (Def.Mot. at 7.)  Defendant also asserts that the "central issue" of the process that led to the 1978 decision "was whether Santa Ysabel was the intended beneficiary for . . . Tract One," and that "the ownership question [of Tract 1] was not only essential to that ruling, it was the entire basis for the proceeding."  (Def.Mot. at 14.)

---

[16] The Restatement uses *res judicata* to refer both to issue and claim preclusion.  RESTATEMENT (SECOND) OF JUDGMENTS, ch. 3, introductory note (1982) ("RESTATEMENT").

[17] Mesa Grande has shown that it was the intended beneficiary of the 1926 Act.  See discussion *supra* at 16–22.

Mesa Grande's effort to obtain title to Tracts 1 and 2 began in the early 1970s when it asked Interior to correct the patents issued to Santa Ysabel under the Mission Indian Relief Act and restore those lands to Mesa Grande's beneficial ownership. (Compl. ¶ 24.) Acknowledging that those Tracts had in fact been patented to Santa Ysabel, Mesa Grande argued that a mistake had been made and the patents had issued to the wrong Band—Mesa Grande did not contend that it was the actual patentee and beneficial title holder of Tract 1.[18] (Memorandum to Director, Office of Hearings and Appeals from Assistant to the Secretary for Indian Affairs at 1 (July, 11, 1973) (attached as Pl.'s Ex. 22)) (noting that the Department was considering "a claim by [Mesa Grande] that a trust patent to two tracts . . . was mistakenly issued in 1893 to" Santa Ysabel). Whether Mesa Grande was the actual patentee of those Tracts was never an issue and never decided.

This is borne out by the recommended decision of the administrative law judge. (*In the Matter of the Dispute Between the Mesa Grande and the Santa Ysabel Bands,* (Feb. 6, 1976) (the "ALJ Decision," attached as Pl.'s Ex. 23.)) The ALJ stated that Mesa Grande "claims that patent to Tracts 1 and 2 should have been issued to it rather that to" Santa Ysabel. (*Id.* at 2.) The ALJ concluded that no mistake had been made based on his findings that Mesa Grande and Santa Ysabel had politically merged through intermarriage.[19] Thus, the only issue that was arguably

---

[18] Defendant's statement that Mesa Grande "requested that the patents be cancelled and reissued with the Mesa Grande Band identified as the beneficial interest holder" acknowledges that the Band conceded that Santa Ysabel was (and is) the beneficial title holder and that the issue was whether a mistake had been made.

[19] See Recommended Finding No. 2 stating that "the evidence . . . tends to establish that as of the period 1891–1893, separateness between these two groups . . . had been diffused by intermixture of the two groups," and Recommended Finding No. 3 stating that it appears that the anthropological standards for determining separateness were "inapplicable." (*Id.* at 10, 11.) Rather than finding that Mesa Grande had no interest in Tracts 1 and 2, as a result of the purported intermixing of the Bands, the ALJ decision recognizes Mesa Grande's rights to the

litigated and actually decided was whether a mistake had been made in patenting the two tracts to Santa Ysabel.[20]

### C. The Quiet Title Act has no bearing on this action.

Mischaracterizing this action as a challenge to Santa Ysabel's beneficial ownership of Tract 1, the Government asserts that this action is barred by the Quiet Title Act, 28 U.S.C. § 2409a ("QTA"). (Def.Mot. at 16.) However, for the reasons discussed *supra* at 22–25, title to the 1926 Tract is not determined by title to Tract 1, and the ownership of Tract 1 was not an issue in the 1978 decision. Accordingly, the Band is not challenging title to Tract 1 and the QTA is inapplicable.

To the extent that the Government's invocation of the QTA addresses the 1926 Tract, Mesa Grande seeks just compensation for the taking of the 1926 Tract, not possession of it. In order to grant the requested relief, this Court must decide whether Mesa Grande had a compensable property interest in that tract, but the need for such a determination does not deprive this court of jurisdiction. In *Oak Forest, Inc.*, the court held that the fact that there "is a quiet title issue involved in determining entitlement to just compensation *vel non*" does not deprive the court of jurisdiction. 23 Cl. Ct. at 94–95 (citing *Bourgeois v. United States*, 212 Ct.

two Tracts. The ALJ's Recommended Finding No. 7 states that "since the Santa Ysabel Band claimed, in effect, that Santa Ysabel and Mesa Grande Bands are not separate entities, a possible solution to the problem might be the creation of a new tribal structure encompassing the individuals living on all three tracts" that "should . . . recognize the ownership rights of the persons now occupying the lands comprising each of the three tracts, and it should give the occupants thereof rights of participation and representation in the new tribal structure." (*Id.* at 11–12.) The 1978 decision also recognizes Mesa Grande rights to the tracts, issuing a similar call for "the establishment of a new tribal governing structure which would reflect the ownership rights of Santa Ysabel and the occupation of the tracts by those of Mesa Grande." (*Id.*) at 5.

[20] Defendant asserts several times that Mesa Grande is trying to use this Court to contest the propriety of the 1891 patents and administrative decisions issued by Interior with regard to Tracts 1 and 2. (Def.Mot. at 15–16.) For all of the reasons discussed *supra* at 22–25, the Band's claim to the 1926 Tract can be decided without regard to the 1978 decision or any other Interior administrative decision.

Cl. at 35–36 n.1) (the court distinguished a suit for possession of the property, which could be brought under the QTA, from a suit for just compensation, which is within the historical jurisdiction of this Court); *accord Yaist v. United States*, 228 Ct. Cl. at 285 (the QTA "does not apply to or affect 'actions which may or could have been brought under' section 1491." (quoting 28 U.S.C. § 2409a)).  As noted in *Oak Forest, Inc.*, "[t]hese rulings are based not only on the traditional jurisdiction of the Court of Claims over takings claims, but on the specific language in the Quiet Title Act disavowing any intent to affect such claims: 'This section does not apply to . . . actions which may be or could have been brought under section[] . . . 1491 . . . of this title.'" 23 Cl. Ct. at 95 (quoting 28 U.S.C. § 2409a).  Moreover, the fact that Mesa Grande might have brought suit under the QTA does not mean it had to choose the possessory remedy over a claim for just compensation under 28 U.S.C. §1491.  *Gila Gin Co. v. United States*, 231 Cl. Ct. 1001, 1003 (1982) (holding that the Court of Claims has jurisdiction over a suit for just compensation and involving a dispute over title "even if the same suit could have been brought . . . in the district court under the Quiet Title Act).["][21]  The QTA has no application to the Band's claim for just compensation for the taking of the 1926 Tract.

## IV.    SANTA YSABEL IS NOT A REQUIRED PARTY.

The compulsory-joinder rule ensures that a lawsuit will not proceed absent a party with interest in the litigation.  *See generally* RCFC 19.  Under Rule 19, the court performs a two-step analysis.  First, the court must determine if an absent party is required.  *Id.* at (a).  If an absent

---

[21]The doctrine of laches, (Def.Mot. at 17, n. 5), has no application here because the Band is not trying to relitigate its claim to Tract 1.  Moreover, there is no evidence regarding the elements of laches—plaintiff's unreasonable delay and resulting prejudice to defendant—before this Court upon which it could make a finding of laches. See Dan B. Dobbs, Law of Remedies: Damages, Equity, Restitution 75, §§ 2.4(4) (abr. 2d ed. 1993).

party is required but joinder is not feasible or impossible, the court decides if, "in equity and good conscience," the case should proceed in their absence. *Id.* at (b). In federal courts, the "philosophy of [Fed. R. Civ. P. 19 is] to avoid dismissal whenever possible." *Stabilisierongfunds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 208 (D.C. Cir. 1981); *see also United Keetoowah Band of Cherokee Indians v. United States*, 480 F.3d 1318, 1324 n.2 (Fed. Cir. 2007) (*"UKB"*) ("because our case law on RCFC 19 is limited, we rely on cases interpreting Fed. R. Civ. P. 19" in necessary party analysis).

### A. Santa Ysabel is not a required party under Rule 19(a).

Rule 19(a) requires joinder when a person:

> claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

RCFC 19(a). In the Federal Circuit, the "interest" requirement of Rule 24(a) (intervention of right) "applies similarly" to Rule 19(a)(2). *See UKB*, 480 F.3d at 1324–25. To be joined as a party to a pending action pursuant to Rule 24(a), an absent party's "interest" "must be 'of such a *direct* and *immediate* character that the [absent party] will either gain or lose by the *direct* legal operation and effect of the judgment.'" *Id.* at 1325 (quoting *Am. Maritime Transp., Inc. v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) (emphasis in original)). The interest cannot be indirect or contingent; instead, it must be a "legally protectable interest," or an interest that "'the *substantive* law recognizes as belonging to or being owned by the applicant.'" *American Maritime*, 870 F.2d at 1561, 1562 (quoting *New Orleans Pub. Serv. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir. 1984) (emphasis in original)); *UKB*, 480 F.3d at 1326–27.

Though the determination of a "legally protectable interest" is a fact-specific inquiry, in the Federal Circuit, claims limited to money damages do not give rise to a "legally protectable

interest" for a nonparty. *See UKB,* 480 F.3d at 1326–27; *see also Wolfchild v. United States*, 77 Fed. Cl. 22, 30–31 (2007) (plaintiffs' claims for money compensation from the federal government for breach of its fiduciary duty related to a series of Appropriation Acts did not require RCFC 19 joinder of two other Indian communities), *rev'd and remanded on other grounds by* 559 F.3d 1228 (Fed. Cir. 2009); *N. Alaska Environmental Center v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986) ("There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a) . . . . The determination is heavily influenced by the facts and circumstances of each case.") (quoting *Bakia v. County of Los Angeles,* 687 F.2d 299, 301 (9th Cir. 1982)).

Here, Santa Ysabel possesses no "legally protectable interest" in the subject of this suit that could be "impair[ed] or impede[d]" by a judgment in Mesa Grande's favor. As detailed *supra* at 22–24, a favorable ruling for Mesa Grande on its claim for money damages related to the taking of the 1926 Tract does not require a determination that Tract 1 was not properly patented to Santa Ysabel. Simply stated, title to the 1926 Tract is not controlled by title to Tract 1 and Defendant's attempt to bootstrap Santa Ysabel into being a required party on that basis fails entirely. Moreover, because Mesa Grande seeks only just compensation, a judgment in its favor would not impair or impede Santa Ysabel's interest in the 1926 Tract.[22] Therefore, contrary to the Government's contention, Santa Ysabel has no "property interest at the center of this case" and is not a necessary party under RCFC 19. (Def.Mot. at 18.)

---

[22] Defendant argues that the "fact that the Mesa Grande Band does not explicitly seek to quiet title in the 1926 or 1893 Parcels does not change" its argument that Santa Ysabel is a necessary party. (Def.Mot. at 18.) But the distinction between a suit for possession and one for just compensation is significant. See *Bourgeois v. United States*, 212 Ct. Cl. at 35 n.1 (noting that claims for just compensation are within the historical jurisdiction of this Court). Moreover, as applied to the 1926 Tract, Defendant's argument that Santa Ysabel is a necessary party would mean that persons in the United States' chain of title following a taking are necessary parties in just compensation cases, which is clearly wrong.

The Federal Circuit's decision in *Rosales* is inapposite. *See Rosales v. United States*, 89 Fed. Cl. 565 (2009), *aff'd*, No. 2010-5028, 2010 U.S. App. LEXIS 19443 (Fed. Cir. Sept. 17, 2010). In *Rosales*, individual Indian plaintiffs alleged a breach of trust based on their claim to beneficial ownership of two parcels (Parcels 04 and 05) held by the Jamul Indian Village. 89 Fed. Cl. at 573. In rejecting their claim, the court stated several times that plaintiffs' claims rested upon the "foundational assumption" that they, not the Jamul Indian Village, were the rightful beneficial owners of Parcels 04 and 05. *Id.* at 580, 581, 583, 584, 587. The court further noted that "[a]djudicating plaintiffs' claims would require determining the threshold question of plaintiffs' ownership of Parcels 04 and 05, and thus necessarily implicates the Village's ownership interest." *Id.* at 585. Here, Mesa Grande does not claim current beneficial ownership of the 1926 Tract. The very nature of Mesa Grande's suit—seeking just compensation for the taking of the 1926 Tract—acknowledges that Santa Ysabel is the beneficial owner of the 1926 Tract. *See Bourgeois,* 212 Ct. Cl. at 35 n.1 (noting the difference between suits for possession and those seeking only just compensation).

The circumstances here are more appropriately analogous to those in *UKB*. In *UKB*, the Tribe brought suit under the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act,[23] ("Settlement Act"), which was enacted to resolve a dispute[24] regarding certain lands held in trust by the federal government (the "Riverbed Lands" and "Disclaimed Drybed Lands"). *UKB*, 480 F.3d at 1319–20. The Settlement Act extinguished all tribal title in those lands, created a settlement fund to be disbursed to the three named Nations that were parties to the Settlement Act, and established a procedure by which non-settling tribes whose claims were also

[23] Pub. L. No. 107-331, 116 Stat. 2845 (2002) (codified at 25 U.S.C. §§ 1779–1779g).

[24] In that dispute, the Cherokee Nation of Oklahoma, Choctaw and Chickasaw tribes alleged that the federal government had mismanaged certain lands held in trust.

extinguished could file claims against the United States. The account to recompense the non-settling tribes was to be funded by ten percent of the funds withheld from the award to the Nations that were party to the Settlement Act.[25] *Id.* at 1321–22.

The Cherokee Nation of Oklahoma ("CNO") moved to intervene for the limited purpose of seeking dismissal of UKB's claim under RCFC 19. After allowing CNO's intervention, the Court ruled that CNO was a necessary and indispensable party, finding that (1) the subject of UKB's action was its claim that it was successor in interest to the Riverbed Lands, or, similarly, that UKB had brought an action to establish title to the Riverbed Lands, and (2) "'[CNO] rightfully claims that . . . it is the titleholder to both the drybed and wetbed lands that are at issue in [the] case,'" and "'any decision regarding the UKB's interest in the lands would directly implicate the [CNO's] interest in the same lands.'" *Id.* at 1325 (quoting *United Keetoowah Band of Cherokee Indians of Oklahoma v. United States*, 67 Fed. Cl. 95, 700, 701 (2005)). On that basis, the court dismissed the case. *UKB*, 480 F.3d at 1323, 1326.

The Federal Circuit reversed. Finding that CNO was not a necessary or indispensable party under RCFC 19, the Federal Circuit noted that the subject matter of UKB's action was improperly characterized by the Court of Federal Claims. Properly characterized, it was an action seeking compensation from the federal government for extinguishment of claims that occurred through enactment of the Settlement Act. The court also determined that CNO's interest was not "legally protectable," and instead was only an "indirect" and "contingent" interest in UKB's claim, noting that CNO would not "gain or lose" title to the lands it alleged ownership over if UKB was awarded money damages under the Settlement Act. *Id*. at 1326–27.

---

[25] All Nations party to the Settlement Act agreed to the above-noted provision that ten percent of the funds that they would otherwise receive would be diverted to fund any claims of a non-settling tribe, if applicable. *UKB*, 480 F.3d at 1323.

Like CNO in *UKB*, Santa Ysabel has no "legally protectable interest" in Mesa Grande's claim because Mesa Grande's claim for just compensation for the taking of the 1926 Tract does not implicate Santa Ysabel's title. At best, Santa Ysabel's interest in Mesa Grande's claim is "indirect" or "contingent," because it will not gain or lose by the operation and effect of a judgment in Mesa Grande's favor.[26] Any judgment in Mesa Grande's favor would necessarily recognize Santa Ysabel as the beneficial owner[27] of the 1926 Tract. Santa Ysabel is therefore not a necessary party to this action.

---

[26] Defendant argues that a ruling in Mesa Grande's favor here would "undoubtedly be used by Mesa Grande to force [Interior] to 'remedy what [Mesa Grande] characterize[s] as interference with [its] ownership rights to [the 1893 Parcels], [and] would necessarily 'impair or impede' [Santa Ysabel's] ownership interest in that land.'" (quoting *Rosales*, 89 Fed. Cl. at 585). This is incorrect. As stated earlier at p. 29 and detailed at length at pp. 22–24, the 1926 Tract is separate and distinct from both Tracts 1 and 2, and a favorable ruling for Mesa Grande related to the 1926 Tract would not "necessarily impair or impede" Santa Ysabel's ownership rights to the 1893 parcels.

[27] Moreover, even if Santa Ysabel possessed any interest in the instant matter, Defendant could adequately protect it. See *Washington v. Daley*, 173 F.3d 1158, 1171 (9th Cir. 1999) ("[t]he United States can adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the [absent] tribe." (quoting *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998)); *Sac and Fox Nation v. Norton*, 240 F.3d 1250, 1259 (10th Cir. 2001) (where Secretary's interest in defending its determinations is "virtually identical" to those of the absent Wyandotte Tribe, that tribe is not a necessary party); *Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996) ("if the nonparties' interests are adequately represented by a party, the suit will not impede or impair the nonparties' interests."). Many of the cases that hold that "it is unlikely that the government could sufficiently represent the competing interests and divergent concerns of [an absent tribe], for the government must also act in keeping with its role and obligations as trustee [to the tribes party to the suit]" are "fixed-fund" or similar situations where an absent party loses directly in proportion to a winning party's gain. See generally *Makah v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456 (9th Cir. 1994). The circumstances surrounding the 1926 Tract, and the nature of the Band's suit, which seeks just compensation, do not create a situation whereby Santa Ysabel would lose in proportion to Mesa Grande's gain. Thus, the United States can protect whatever legally protectable interest Santa Ysabel may have.

**B.** **This action can proceed "in equity and good conscience" without Santa Ysabel.**

Even if Santa Ysabel were "required" under Rule 19(a), this matter can proceed "in equity and good conscience" in its absence. RCFC 19(b). In a Rule 19(b) analysis, the following four factors are considered:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> > (A) protective provisions in the judgment;
> >
> > (B) shaping the relief; or
> >
> > (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate, and
>
> (4) whether the person would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* "These four factors are not rigid, technical tests, but rather guides to the overarching equity and good conscience determination." *Brown v. United States*, 42 Fed. Cl. 538, 565 (1998) (quoting *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986), *aff'd*, 195 F.3d 1334 (Fed. Cir. 1999)).

A balance of the four factors weighs against dismissal. On the first factor, Santa Ysabel would not be prejudiced by a judgment in favor of Mesa Grande rendered in its absence, because, as argued above: (1) the 1926 Tract is separate from Tract 1; and, (2) Mesa Grande seeks only money damages. Thus, Santa Ysabel's beneficial ownership of the 1926 Tract—the only "legally protectable interest" it arguably possesses in relation to this case—will not be affected. *UKB*, 480 F.3d at 1326–27. Moreover, and as detailed *supra* at pp. 32 fn. 27, Defendant can adequately represent Santa Ysabel in its absence, which further lessens any potential prejudice. *See Sac and Fox*, 240 F.3d at 1259; *Ramah*, 87 F.3d at 1351. If the potential for prejudice is minimal, the Court "need not be concerned with the second factor, which

addresses the availability of means for lessening or avoiding prejudice." *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1412 (10th Cir. 1996). In any event, by extension of the first factor, consideration of the second and third factors also weighs against dismissal, as the only relief available—just compensation—does not affect Santa Ysabel's beneficial ownership of the 1926 Tract, and its adequacy is undisputed. Lastly, consideration of the fourth factor weighs heavily in Mesa Grande's favor. The only forum that the Band has for pursuing its takings claim is this Court,[28] and there is no "'potential of injury to [Santa Ysabel's ] interest'" by a favorable money judgment to Mesa Grande that would warrant "'heightened protection'" or dismissal because of Santa Ysabel's inability to be joined based on its sovereign immunity. *Klamath Tribe Claims Comm. v. United States*, 106 Fed. Cl. 87, 94–95 (2012) (citation omitted), *aff'd*, 541 Fed. App'x 974 (Fed. Cir. 2013). Therefore, based on the above, Santa Ysabel is not a required party to this action, and dismissal on those grounds would be manifestly improper.


**CONCLUSION**

All of the Government's arguments in favor of dismissal proceed from its erroneous assertion that title to Tract 1 determines title to the 1926 Tract. However, the legal authority setting aside the two Tracts is not the same, and ownership of the 1926 Tract must be determined without regard to Tract 1.

Because title to Tract 1 is not determinative of title to the 1926 Tract, Mesa Grande's claim did not accrue until 1980 when all of the events which fixed the Government's liability

---

[28] The Court of Federal Claims has exclusive jurisdiction over the takings and breach of fiduciary duty claims at issue in this case. See *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1729–31, 179 L. Ed. 2d 723 (2011). Thus, this Court should be "'extra cautious'" before dismissing this action. *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) (quoting *Makah*, 910 F.2d at 560); *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 501 n.9 (7th Cir. 1980) ("the absence of an alternative forum would weigh heavily, if not conclusively against dismissal.").

occurred. But Mesa Grande did not know at that time, nor should it have known, that the lands that Defendant had caused Congress to convey to the Band in 1926 had been given to another tribe. The claim's accrual must therefore be suspended until 2010 when Mesa Grande learned of Defendant's breach of trust, and this action has been timely filed. Title to the 1926 Tract was not at issue in the administrative proceedings that took place in the 1970s, so the Band is neither precluded from establishing that it possessed a compensable interest before the 1980 conveyance to Santa Ysabel, nor is Santa Ysabel a required party.

For all of these reasons, the Government's motion to dismiss should be denied.


March 3, 2015.

Respectfully submitted:

_____/s/ Derril B. Jordan_____
DERRIL B. JORDAN
D.C. Bar No. 470591
JORDAN LAW OFFICES PLLC
1730 Rhode Island Ave. NW
Suite 501
Washington, D.C. 20036
Tel: (202) 223-0893
Fax: (202) 223-0894
djordan@dbjordanlaw.com

*Attorney of Record for Plaintiff*
*Mesa Grande Band of Mission Indians*

Of Counsel:

Don B. Miller                              Michael D. Sliger
DON B. MILLER, P.C.                        JORDAN LAW OFFICES PLLC
1305 Cedar Avenue                          929 Elmsford Dr.
Boulder, CO  80304                         Clawson, MI 48017
(303) 545-5533                             (810) 394-0072
dbmiller01@msn.com                         msliger@dbjordanlaw.com

## CERTIFICATE OF SERVICE

I, Derril B. Jordan, an attorney, certify that on March 3, 2015, I served the above and foregoing ***Plaintiff's Memorandum in Opposition to the United States' Motion Dismiss for Lack of Jurisdiction*** by causing true and accurate copies of such paper to be filed and transmitted to the persons shown below via the Court's CM/ECF electronic filing system.

UNITED STATES OF AMERICA

_____ /s/ Derril B. Jordan _____
Derril B. Jordan