**Plaintiff's Exhibit 11**

MG-2460

Union Calendar No. 790

82d Congress, 2d Session — — — — House Report No. 2503

# REPORT

WITH RESPECT TO

## THE HOUSE RESOLUTION AUTHORIZING THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS TO CONDUCT AN INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

PURSUANT TO H. RES. 698 (82d CONG.)



DECEMBER 15, 1952.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed with illustrations

# REPORT

WITH RESPECT TO

## THE HOUSE RESOLUTION AUTHORIZING THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS TO CONDUCT AN INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

PURSUANT TO H. RES. 698 (82d CONG.)



DECEMBER 15, 1952.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed with illustrations

UNITED STATES
GOVERNMENT PRINTING OFFICE
26496                WASHINGTON : 1953

# REPORT WITH RESPECT TO THE HOUSE RESOLUTION AUTHORIZING THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS TO CONDUCT AN INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

DECEMBER 15, 1952.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed with illustrations

Mr. MURDOCK, from the Committee on Interior and Insular Affairs, submitted the following

# REPORT

[Pursuant to H. Res. 698, 82d Cong.]

## 1. TEXT OF THE RESOLUTION

House Resolution 698 which passed the House on July 1, 1952, provides as follows:

RESOLUTION

*Resolved,* That the Committee on Interior and Insular Affairs, acting as a whole or by subcommittee, is authorized and directed to conduct a full and complete investigation and study of the activities and operations of the Bureau of Indian Affairs, with particular reference to (1) the manner in which the Bureau of Indian Affairs has performed its functions of studying the various tribes, bands, and groups of Indians to determine their qualifications for management of their own affairs without further supervision of the Federal Government; (2) the manner in which the Bureau of Indian Affairs has fulfilled its obligations of trust as the agency of the Federal Government charged with the guardianship of Indian property; (3) the adequacy of law and regulations to assure the faithful performance of trust in the exchange, lease, or sale of surface or subsurface interests in or title to real property or disposition of personal property of Indian wards.

The committee shall report to the House (or to the Clerk of the House if the House is not in session) as soon as practicable during the present Congress the results of its investigation and study, together with such recommendations as it deems advisable, including (1) a list of the tribes, bands, or groups of Indians found to be qualified for full management of their own affairs; (2) legislative proposals designed to promote the earliest practicable termination of all Federal supervision and control over Indians; (3) a listing of functions now carried on by the Bureau of Indian Affairs which may be discontinued or transferred to other agencies of the Federal Government or to the States; (4) names of States where further operation of the Bureau of Indian Affairs should be discontinued; (5) recommended legislation for removal of legal disability of Indians by reason of guardianship by the Federal Government; (6) findings concerning transactions involving the exchange, lease, or sale of lands or interests in lands belonging to Indian wards, with specific findings as to such transactions in the State of Oregon; (7) recommendations to the Attorney General for action by the Department of

1

(8) Recommended legislation for removal of legal disability of Indians by reason of guardianship by the Federal Government; and

(9) Findings concerning transactions involving the exchange, lease, or sale of lands or interests in lands belonging to Indian wards, with specific findings as to such transactions in the State of Oregon.

## 3. TEXT OF QUESTIONNAIRE SENT TO ALL BUREAU OFFICIALS

The request of the committee resulted in the Bureau's sending out to all of its Bureau officials a letter accompanied by a detailed questionnaire, which documents are as follow:

DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
*Washington D. C., August 5, 1952.*

MEMORANDUM

To: All Bureau officials.
From: Commissioner, Bureau of Indian Affairs.
Subject: Withdrawal programing.

During the past fiscal year the Bureau has devoted a great deal of effort to the development of withdrawal concepts and policy. Bureau personnel have been encouraged to give increasing emphasis to withdrawal objectives in their work with Indian groups and individuals in program development and effectuation. At the central office, we have established the Division of Program, whose primary responsibilities are to render guidance and assistance to Bureau personnel engaged in withdrawal programing at area and agency levels and to formulate Bureau withdrawal programs in cooperation with other central-office staff at national levels. We have reached the stage where it has become desirable to crystallize certain Bureau withdrawal policies, establish methods basic to the development of withdrawal programing, and fix responsibilities for proceeding with the task.

At this point, I want to emphasize that withdrawal program formulation and effectuation is to be a cooperative effort of Indian leaders and community groups affected, side by side, with Bureau personnel. We must lend every encouragement to Indian initiative and leadership. I realize that it will not be possible always to obtain Indian cooperation. However, I want our efforts to obtain such cooperation to be unceasing. In addition to the importance of consultation with Indians, I wish also to stress Indian participation with respect to negotiations with States, political subdivisions of States, and Federal agencies, where such negotiations relate to Bureau withdrawal.

I think it may be fairly said that current congressional actions with regard to the Bureau of Indian Affairs and Indian appropriations indicate future appropriations will be limited largely to financing items which will facilitate withdrawal. This approach is already evident in both House and Senate with respect to appropriation of construction funds. Under this condition it is imperative that the Bureau develop and implement programs to assist Indians to become better qualified to manage their own affairs. Full understanding by the tribal membership should be attained in any event, and agreement with the affected Indian groups must be attained if possible. In the absence of such agreement, however, I want our differences to be clearly defined and understood by both the Indians and ourselves. We must proceed, even though Indian cooperation may be lacking in certain cases.

I look to area and agency personnel, as the representatives of the Bureau of Indian Affairs, to assume primary responsibility for instituting and carrying on cooperative withdrawal programing work at field levels. It is in the field that we have the basic sources of necessary information and the means of enlisting Indian support and participation. In your work with Indian groups I want you to use every opportunity to place before the Indian tribal membership the need for and advantages to be derived from cooperative withdrawal programing effort. Tribal leaders should be encouraged to obtain maximum membership participation in this work.


4    INVESTIGATION OF THE BUREAU OF INDIAN AFFAIRS

FIRST GENERAL WITHDRAWAL PROGRAMING ASSIGNMENT

As the first major step in carrying out the Bureau's share of the above-mentioned responsibilities for formulation and effectuation of withdrawal programs, I am requesting the preparation of certain documents. These documents encompass a compilation of basic facts bearing on withdrawal programing for each tribe, band, identifiable group, or geographical area; a report on withdrawal-program accomplishment, present status, and future plans; a delineation of tasks yet to be completed in order to effect complete withdrawal; and a listing of tribes, bands, etc., found to be qualified for management of their own affairs. These documents will serve a number of very important purposes, including the following: provide a working tool in withdrawal programing; provide a source of information to all interested parties, particularly congressional committees, with respect to Indian and Bureau affairs; provide a ready reference on withdrawal accomplishment to date; and serve as a basis for development of a system of periodic reporting of future withdrawal-program status and accomplishment.

Area directors and superintendents have primary Bureau responsibility for preparation of these documents. The central-office staff function is primarily one of furnishing guidance and consultative services to the field. Area directors will be advised in the near future by the Division of Program as to plans for early field visits by Division representatives.

Final field drafts of documents must be completed in the field and transmitted to the central office not later than September 15, 1952.

The documents to be prepared and procedures to be followed are as follows:

1. Area and agency staffs will assemble all available factual data pertinent to an appraisal of withdrawal potential of each tribe, band, identifiable group, or appropriate geographical area.

*Suggested references*

(a) Compilation of Material Relating to the Indians of the United States and the Territory of Alaska, Including Certain Laws and Treaties Affecting Such Indians (Subcommittee on Public Lands, House of Representatives. H. R. 66, 81st Cong., 2d sess., serial No. 30, June 13, 1950).

(b) Statistical Charts Regarding the Indians of the United States (undated, Subcommittee on Indian Affairs of House Committee on Interior and Insular Affairs).

(c) Material recently submitted by area offices to House Committee on Interior and Insular Affairs for revision of (b), above.

(d) Any area and agency reports containing data pertinent to withdrawal.

(e) Such other records as may be necessary to provide the data required.

2. Area and agency offices will prepare the following documents for each tribe, band, identifiable group, or appropriate geographical area, calling on the Division of Program staff for guidance and consultation which will be provided to the extent that staff may be available.

A. Document: Summary of facts pertinent to withdrawal, using the attached checklist and guide (including item 1 through item 28).

B. Document: A summary of accomplishment in withdrawal by termination or transfer of Bureau services to other auspices, in terms of actual withdrawal; also, a description of uncompleted withdrawal negotiations instituted with Indians, States, political subdivisions of States, etc., and a definition of the current status of such negotiations. (See Document B form, attached.)

C. Document: A listing and description of tasks remaining to be done to effect complete withdrawal of Bureau services by termination or transfer to other auspices, delineating obstacles preventing or impeding withdrawal, recommending procedures to overcome the obstacles and effect complete withdrawal, and designating those procedures to be given top priority in staff attention. (See Document C form, attached.)

D. Document: List those tribes, bands, identifiable groups, and appropriate geographical areas which, in the opinion of the field, are ready for complete withdrawal of Bureau rssponsibility for services and termination of trusteeship responsibilities, assuming that these responsibilities and services will be transferred to the Indians themselves, local or State governments or other auspices, indicating those tribes, bands, etc., assigned top priority for further staff attention.

3. Upon submittal of these documents to the central office, the Division of Program will consolidate them for all tribes, bands, groups, and geographical areas.

Urgency in completion of this assignment is indicated by the date of September 15, 1952, fixed for submission of final field drafts of documents.

D. S. MYER, *Commissioner.*

# GENERAL INSTRUCTIONS FOR PREPARATION OF DOCUMENTS A, B, C, AND D

## GENERAL INSTRUCTIONS

1. Data shall be submitted separately for each tribe, band, identifiable group, or geographical area. In determining which of the four units is to be used in presentation of data called for in Documents A, B, C, and D, the field will make a determination as to which unit is the most suitable for withdrawal programing purposes. In cases where withdrawal programing as to certain functions will be on the basis of a smaller unit and withdrawal programing as to certain other functions will be on the basis of a larger unit, use the smaller unit. A reservation will quite often be the most appropriate unit even though two or more tribes or bands may be located on such reservation.

*Examples*

Example 1: California will be reported as a unit because withdrawal programing is being carried on for the State as a whole.

Example 2: Assume for reservation X:
  (a) Residents:
    1. Two tribes are located on the reservation.
    2. Segments of two other tribes are located on the reservation.
  (b) How withdrawal programing will be conducted:
    1. Bureau withdrawal as to most functions will be negotiated with residents of the reservation as a unit.
    2. Bureau withdrawal as to education and welfare is being developed to be made applicable throughout the State in which reservation X and certain other reservations are located.

*Selection of reporting unit*

  (a) The State as a unit is rejected because as to certain functions the Bureau will deal only with Indians at reservation X.
  (b) Reservation X is selected as a reporting unit because withdrawal of certain functions will be worked out with the tribes and segments of tribes at the reservation as a unit and no single tribe or segment of a tribe will be an important element in development of the withdrawal program. Hence, reservation X is the smallest unit important from the standpoint of withdrawal programing.

2. In narrative sections of documents, be brief, but don't leave out facts important to an understanding of the subject under discussion. Assume that persons using the report will have no prior specific information about the particular tribe, band, etc., under discussion, although such person will have an understanding of the general relationships between the Federal Government and Indians.

## SPECIFIC INSTRUCTIONS

1. Submit original and one copy of all documents to central office.
2. Prepare all documents on white paper, 8- by 10½-inch size.
3. Number pages of each document consecutively, starting the page numbering of each document with page 1.
4. Forms have been prepared by the Central Office for tables to be completed as a part of document A; in addition, forms for documents B and C have been prepared. Forms are to be duplicated in the field with exactly the same headings and columnar arrangements specified by the cental office.
5. The field will design its own form for document D.
6. Specific instructions have been prepared for document A. These instructions appear on the first sheet of the check list and guide. Specific instructions have been prepared for documents B and C together. They are enclosed as separate sheets. No specific instructions have been prepared for document D.

## INSTRUCTIONS FOR PREPARATION OF DOCUMENTS B AND C

### GENERAL INSTRUCTION

Reports will cover generally only those functions performed by the Bureau. Functions performed for Indians by themselves or others will not be reported unless the performance is so unsatisfactory as to be an important obstacle to complete withdrawal.

SPECIFIC INSTRUCTIONS

1. Do not report more than one function on a page.
2. Do not report more than one tribe, band, identifiable group, or appropriate geographical area on one page.
3. Every function as listed in section 4 below, will be reported on. If the Bureau renders no service currently under a listed function, complete the heading for that particular page and state in columnar space "Bureau renders no service."
4. In each document report the functions in the following order.
   1. Education.
   2. Health.
   3. Welfare.
   4. Extension.
   5. Training, relocation, and replacement.
   6. Law and order.
   7. Roads.
   8. Credit (Federal only).
   9. Handling of individual Indian money.
   10. Land.
   11. Soil and moisture conservation.
   12. Forest and range management.
   13. Irrigation.
   14. Utilities (communication and electric power only).
   15. Supervision of development and administration of tribal enterprises carried on primarily for profit (tourist court, sawmill, fish cannery, trading posts, etc.).
   16. Supervision of development and administration of tribal activities of a nongovernmental nature carried on primarily as a service to all or some of members (repayment-in-kind cattle program, medical services, credit, scholarships, etc.).
   17. Supervision of tribal activities of a strictly governmental nature (tribal law and order, licensing, welfare, etc.).
   18. Bureau functions performed but not listed above (specify in heading).

DOCUMENT A—CHECK LIST AND GUIDE FOR PREPARATION OF FACTUAL DATA PERTINENT TO AN APPRAISAL OF WITHDRAWAL POTENTIAL

(Including items Nos. 1 through 28)

GENERAL INSTRUCTIONS

1. This check list and guide has been prepared to assure uniformity in organization and comparability of content. Therefore, data must be presented under the headings and in the order of headings shown below.
2. Be brief, but give the important elements in narrative sections.

SPECIFIC INSTRUCTIONS

1. Leave 1 inch of space at the top of each page for binding.
2. Show the following 1 inch below the top of each page: Name of tribe, band, identifiable group, or appropriate geographical area; and page number.

*1. Indian population*                                               Number

A. Number of living persons on tribal roll_____ _____
B. Number of persons for whom Bureau assumes some responsibility,
     on reservation or in vicinity thereof_____ _____
C. Number of families for whom Bureau assumes some responsibility,
     on reservation or in vicinity thereof_____ _____
D. Number of full bloods_____ _____
E. Number who cannot speak English_____ _____
F. Number of adults who cannot read and write_____ _____
G. Tribal enrollment record:
     (1) Describe adequacy and currency of record.
     (2) List any withdrawal purposes for which up-to-date record would be needed (distribution of tribal assets, etc.).

*Laguna Reservation, Calif.*

There were five Laguna Indians on this reservation in 1950. The original area was 160 acres.[3] In 1950, it consisted of 320 acres of tribal lands.

This reservation was established on February 10, 1893, under authority of the act of 1891, above.

Executive Orders 2795 of January 26, 1918, and 4765 of November 23, 1927, extended the trust periods for ten years, each, but since the reservation is subject to the benefits of the Howard-Wheeler Act[11], the trust period is extended indefinitely.

An act of August 4, 1947, provided that patents were to be issued to members of the Laguna band on certain parts of the reservation (61 Stat. 731, c. 457).

*Los Coyotes Reservation, Calif.*

There were 91 Los Coyotes Indians on this reservation in 1950. The original area was 160 acres in 1900.[3] In 1950, it consisted of 25,050 acres of tribal lands.

An executive order of May 6, 1889, set apart lands for this reservation.

On June 19, 1900, the present reservation was established under authority of the act of 1891, above.

Executive Order 1914 of April 13, 1914, transferred lands from the Cleveland National Forest, Calif., to the Coyotes Reservation.

*Luiseño Reservation, Calif.*

See below, Pechanga or Temecula Reservation.

*Manzanita Reservation, Calif.*

There were 63 Manzanita Indians on this reservation in 1950. The original area was 640 acres.[3] In 1950, the area consisted of 3,520 acres of tribal lands.

This reservation was established on February 10, 1893, under authority of the act of 1891, above.

Executive Orders 2795 of January 26, 1918, and 4765 of November 23, 1927, extended the trust period for ten years, each, but since the reservation is subject to the benefits of the Howard-Wheeler Act,[11] the trust period is extended indefinitely.

*Mesa Grande Reservation, Calif.*

See also Santa Ysabel Reservation, below.

There were 241 Mesa Grande Indians on this reservation in 1950. The original area was 120 acres.[3] In 1950, the area consisted of 5,963 acres of tribal lands.

Executive Orders of December 27, 1875, and June 19, 1883, set apart lands for this reservation.

Executive Orders 2795 of January 26, 1918, and 4765 of November 23, 1927, extended the trust period for ten years, each.

Executive Order 4297 of August 25, 1925, set apart additional lands until 1927 for this reservation.

An act of May 10, 1926, provided that lands set apart were to become a part of the reservation. This same act stated that Mesa Grande Reservation was Santa Ysabel Reservation No. 1 (44 Stat. 496, c. 280).

An Act of June 3, 1926, authorized the Secretary to purchase a tract of 573 acres of land to add to the Santa Ysabel Reservation, and located this tract at the site of the present Mesa Grande Reservation. (44 Stat. 690, c. 458).

*Mission Creek Reservation, Calif.*

There were twenty Mission Indians on this reservation in 1950. The area, when established in 1921, was 2,560 acres.[3] In 1950, the area consisted of 2,560 acres (158 acres, trust allotted; 2,402 acres, tribal).

An executive order of May 15, 1876, established a reservation in this area.

The present reservation was established on January 28, 1921, under authority of the act of 1891, above, as amended, and supplemented.

Acts of August 1, 1914, etc., appropriating funds for purchase of lands for homeless California Indians, *See* California Indians.

*Morongo Reservation, Calif.*

There were 316 Morongo or Serrano Indians on this reservation in 1950. The original area, as established in 1908, was 11,059 acres.[3] In 1950, it consisted of 31,723 acres (1,427 acres, trust allotted; 30,285 acres, tribal; 11 acres, reserved by the government).

Executive orders of August 25, 1877, and March 9, 1881, set apart lands for this reservation.

The present reservation was patented to the Morongo band on December 14, 1908, by the Secretary under authority of the act of March 1, 1907, above.

Executive Orders 1224 of July 7, 1910, and 1485 of February 20, 1912, restored portions to the public domain.

A proclamation of November 12, 1913, reduced the reservation (38 Stat. 1966–1967).

A proclamation of August 31, 1915, excluded certain lands from Cleveland National Forest for the Indians on this reservation (39 Stat. 1747–1748).

An act of June 1, 1926, increased the reservation (44 Stat. 679, c. 434).

Executive Order 6341 of October 17, 1933, extended the trust period on the reservation for ten years (until 1943).

*Pala Reservation, Calif.*

There were 223 Pala Indians on this reservation in 1950. The original area on February 10, 1893, was 160 acres.[3] In 1950, the area consisted of 20,496 acres (1,374 acres, trust allotted; 19,107 acres, tribal; 15 acres, reserved by the government).

An executive order of December 27, 1875, set apart lands for this reservation and executive orders of May 3, 1877, and July 24, 1882, restored portions to the public domain.

An act of May 27, 1902, appropriated $100,000 for purchase of land in southern California for Mission Indians formerly residing on Rancho San Jose de Valle or Warners Ranch in San Diego, California, and the Secretary was authorized to cause the purchased lands to be allotted in severalty under the General Allotment Act.[5] (32 Stat. 257, c. 888.)

of 3,486 acres (418 acres, trust allotted; 3,046 acres, tribal; 22 acres, owned by the government).

An executive order of December 27, 1875 established the Rincon reservation and an executive order of March 2, 1881 increased the size of the reservation.

The present reservation was established on September 13, 1892 under authority of the act of 1891, above.

Executive Orders 2684 of August 16, 1917 and 4687 of July 11, 1927 extended the trust period on the reservation for ten years, each (until 1937).

*San Manuel Reservation, Calif.*

There were forty-nine San Manuel Indians on this reservation in 1950. The original area was 640 acres.[3] In 1950, the area consisted of 653 acres of tribal lands.

This reservation was established on August 31, 1893 under authority of the act of 1891, above.

Executive Orders 2795 of January 26, 1918 and 4765 of November 23, 1927 extended the trust period for the reservation for ten years, each (until 1937).

*San Pasqual Reservation, Calif.*

There were nine San Pasqual Indians on this reservation in 1950. The area when established in 1910 and in 1950, consisted of 1,343 acres of tribal land.

An executive order of January 31, 1870 reserved lands for the San Pasqual and Pala Valley Indians, and an executive order of February 17, 1871 revoked the order of 1870.

The present reservation was established on July 1, 1910, under authority of the act of 1891, as amended, and supplemented.

Executive Order of April 15, 1911 set aside land for a reservoir site to be used in connection with irrigation of land on the reservation.

*Santa Rosa Reservation, Calif.*

There were 53 Santa Rosa Indians on this reservation in 1950. The original area in 1907 was 8,360 acres.[3] In 1950, the area consisted of 11,093 acres of tribal lands.

This reservation was established on February 2, 1907 under authority of the act of 1891, above, as amended.

An act of April 17, 1937 authorized the Secretary to purchase 640 acres in the name of the United States, in trust for the Santa Rosa band. (50 Stat. 69, c. 111.)

*Santa Ynez Reservation, Calif.*

There were 87 Santa Ynez Indians on this reservation in 1950. The original area in 1901 was 76 acres[3] and in 1950 it consisted of 99 acres of tribal lands.

This reservation was established on December 27, 1901 under authority of the act of 1891, above. It consisted of the right of occupancy only; title remained in the Bishop of Monterey.

*Santa Ysabel Reservation, Calif.*

There were 279 Santa Ysabel Indians on this reservation in 1950. The original area in 1893 was 9,159 acres.[3] In 1950, the

the area consisted of 9,679 acres (9,669 acres, tribal; 10 acres reserved by the government).

An executive order of December 27, 1875 set apart lands for the Santa Ysabel Reservation and executive orders of March 3, 1877, January 17, 1880 and February 5, 1883 restored portions to the public domain.

The present reservation was established on February 10, 1893 under authority of the act of 1891, above.

Executive Orders 2795 of January 26, 1918 and 4765 of November 23, 1927 extended the period of trust on the reservation for 10 years, each (until 1937).

An act of May 10, 1926 stated that Mesa Grande Reservation, above, was Santa Ysabel Reservation No. 1 (44 Stat. 496, c. 280).

An act of June 3, 1926 authorized the Secretary to purchase 573 acres for the reservation (44 Stat. 690, c. 458).

*Serrano Reservation, Calif.*

   *See* Morongo Reservation, *above.*

*Soboba Reservation, Calif.*

There were 137 Sobobo Indians on this reservation in 1950. The original area in 1913 was 80 acres.[3] In 1950, the area consisted of 5,116 acres of tribal lands.

An executive order of June 19, 1883 set apart land for the Sobobo Reservation, but a part of it was restored to the public domain by an executive order of March 22, 1886.

The present reservation was established on June 10, 1913 under authority of the act of 1891, above, as amended and supplemented.

*Sycuan Reservation, Calif.*

There were 37 Sycuan Indians on this reservation in 1950. The original area was 640 acres.[3] In 1950, it consisted of 604 acres (234 acres, trust allotted; 369 acres, tribal; 1 acre, owned by the government).

An executive order of December 27, 1875 set lands apart for this reservation.

Executive Order 2795 of January 26, 1918 extended the trust period ten years, Executive Order 3383 of January 7, 1921, 25 years and Executive Order 4765 of November 23, 1927, 10 years (until 1937).

*Temecula Reservation, Calif.*

   *See* Pechanga Reservation, above.

*Torres-Martinez Reservation, Calif.*

There were 202 Torrez-Martinez Indians on this reservation in 1950. The original area in 1909 was 16,387 acres.[2] In 1950, the area consisted of 30,132 acres (8,550 acres, trust allotted; 21,535 acres, tribal and 47 acres, reserved by the government).

An executive order of May 15, 1876 set apart lands for this reservation.

An act of February 11, 1903 added 640 acres of State lands to the reservation in exchange for lands to be set apart for the Torres band under the act of 1891, above (32 Stat. 822, c. 542).

Executive Order 7009 of April 10, 1935 extended the period of trust for ten years (until 1945).